STATE OF CONNECTICUT *v.*
EARL THOMPSON
(AC 32040)

Bishop, Beach and Borden, Js.

Argued February 14—officially released April 26, 2011

*Gerald M. Beaudoin*, with whom, was *Francisco A. Cardona*, for the appellant (defendant).

*Linda Currie-Zeffiro*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *David Zagaja*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BISHOP, J. The defendant, Earl Thompson, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134 (a) (4) and 53a-48, robbery in the first degree in violation of § 53a-134 (a) (4) and kidnapping in the first degree as an accessory in violation of General Statutes §§ 53a-92 (a) (2) (B) and 53a-8. On appeal, the defendant claims that the court (1) improperly denied his motion to dismiss and his motion to suppress certain DNA evidence, (2) failed to instruct the jury as to that DNA evidence as he requested and (3) abused its discretion in denying his motion for a new trial. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 11:30 p.m. on August 10, 2004, Stephan Julian arrived at her home in Bloomfield. At that time, her son, Damien Gardner, resided with her but was not present that night. As Julian entered the house, she was confronted by a man with a gun. A second man, also armed with a gun, quickly emerged.

Because the faces of both men were covered, Julian could not recognize them, but she was able to determine that they were both dark skinned with Jamaican accents. The men repeatedly asked Julian where money was located in the house and forced her to lie on the floor in a downstairs bathroom while they searched the house. The men periodically checked on Julian, and she could hear them going up and down the stairs of her home. At one point, she heard an upstairs toilet flush. Eventually, when Julian no longer heard the men in her home, she peeked out of the bathroom and saw that it was light outside. She exited the bathroom and called the police.

Detective Eric Kovanda was primarily responsible for processing the crime scene. In addition to other forensic evidence, Kovanda collected two urine samples from the rim of the toilet located in one of the upstairs bathrooms. The DNA profile developed from the urine swabs did not match any in the existing offender databases. In 2006, two jailhouse informants identified the defendant as a suspect, and, consequently, on February 11, 2008, the police collected a DNA sample from the defendant for comparison to the DNA profile developed from the urine samples that had been collected from the crime scene.

On February 28, 2008, Kovanda met with the defendant to discuss the August 11, 2004 incident. The defendant indicated that he knew Julian's son, Gardner, and that he had been at their house a week or a few days prior to August 11, 2004. The defendant was arrested and charged with conspiracy to commit robbery in the first degree, robbery in the first degree, burglary in the first degree and kidnapping in the first degree as an accessory.

Prior to trial, the defendant filed a motion to dismiss claiming that there was insufficient evidence to prosecute him because the DNA evidence that the state

intended to introduce at trial was inadmissible. The defendant also filed a motion to suppress the DNA evidence on the basis that the state had consumed the sample in its DNA testing, thus depriving the defendant of an independent analysis. The court heard argument from both parties on the defendant's motions. The court denied both motions from the bench.

At the close of evidence, the state conceded that it had not presented sufficient evidence to support the burglary charge, and the court granted the defendant's motion for a judgment of acquittal as to that charge. The jury found the defendant guilty of the remaining counts. The defendant filed a motion for a new trial, which the court denied. The court sentenced the defendant to a term of twenty years incarceration on each of the robbery counts, to run concurrently, and a term of twenty-five years on the kidnapping count, to run consecutively to the other terms, for a total effective sentence of forty-five years. This appeal followed.

I

The defendant first claims that the court improperly denied his motions to dismiss and to suppress. The defendant argues that the charges against him should have been dismissed. He reasons that the DNA evidence should have been suppressed because the cotton swabs carrying the urine samples that had been obtained at the crime scene were fully consumed during the testing process, effectively precluding him from performing his own test of the samples, and he claims that, without the DNA evidence, the state had an insufficient basis for proceeding against him. As to the destruction of the swabs leaving no material for testing by the defense, the defendant contends that such a deprivation violated his right to due process under article first, § 8, of the Connecticut constitution. We are not persuaded.

The following additional facts are pertinent to this claim. At trial, Nicholas Yang, a supervisor at the state forensic laboratory, testified that he performed a DNA analysis on each of the two urine samples that had been collected at the crime scene on August 11, 2004. Although the samples were submitted for testing shortly after the crime occurred, testing did not begin until February, 2005, and the resulting report was generated in April, 2005. Neither at the time of submission to the laboratory nor at the time of testing did the state have a suspect for the August 11, 2004 incident. Yang testified that, typically, when testing a sample for DNA, laboratory personnel take what they need from the swab and save the remainder for further testing or testing by the defense, but, if the sample is not large enough, they might have to test the entire swab, as they did in this case. Here, both samples yielded DNA results, but both were exhausted in the testing process. Although the original swab was no longer available for further testing, Yang testified that some of the genomic DNA sample was available for further testing. In other words, Yang explained, "because we had to use—we used both cotton swabs, they were used for extraction, the cotton swabs cannot be used again to be extracted because you've gotten—or removed all the DNA from that swab, therefore that swab is consumed for testing, meaning you cannot—you can no longer get any DNA from that swab. But the extract that we do have, that we extracted from the cotton swab, we still have. So if anyone wanted to do any type of retesting, they could take that genomic portion that we would give you a portion of and do any type of reamplification with their DNA kit and see what results they get."

As to the defendant's claim that the state's failure to preserve the cotton swabs containing the inculpatory DNA evidence violated his due process rights, our Supreme Court has set forth the analytical path for

determining whether the failure of the police to pre-
serve evidence constitutes a due process violation
under our state constitution. In *State* v. *Morales*, 232
Conn. 707, 727, 657 A.2d 585 (1995), the court expressly
rejected the federal standard of *Arizona* v. *Youngblood*,
488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).[1]
The court in *Morales* held that "the good or bad faith
of the police in failing to preserve potentially useful
evidence cannot be dispositive of whether a criminal
defendant has been deprived of due process of law.
. . . Rather, in determining whether a defendant has
been afforded due process of law under the state consti-
tution, the trial court must employ the [*State* v. *Asher-
man*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert.
denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814
(1985)] balancing test, weighing the reasons for the
unavailability of the evidence against the degree of prej-
udice to the accused. More specifically, the trial court
must balance the totality of the circumstances sur-
rounding the missing evidence, including the following
factors: the materiality of the missing evidence, the
likelihood of mistaken interpretation of it by witnesses
or the jury, the reason for its nonavailability to the
defense and the prejudice to the defendant caused by
the unavailability of the evidence." (Internal quotation
marks omitted.) *State* v. *Morales*, supra, 726–27; see
also *State* v. *Joyce*, 243 Conn. 282, 300–301, 705 A.2d
181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523,
140 L. Ed. 2d 674 (1998). "[P]olice [are not required] to
preserve every shred of physical evidence, every object
. . . [seized] from a crime scene, no matter how remote
or tangential to the case the item seems to be. The
. . . court should . . . [consider] the reason for the
unavailability of an item of evidence, as well as the

---

[1] In *Arizona v. Youngblood*, supra, 488 U.S. 58, the United States Supreme
Court stated: "We therefore hold that unless a criminal defendant can show
bad faith on the part of the police, failure to preserve potentially useful
evidence does not constitute a denial of due process of law."

motivation and good or bad faith of the police in failing to preserve that evidence." *State* v. *Morales*, supra, 723. Applying these factors to the present case, we conclude that the defendant's due process rights under our state constitution were not violated by the failure to preserve the cotton swabs from which the DNA sample was obtained.

First, we cannot conclude that the cotton swabs were material as that term is employed in this analysis. "The measure of materiality is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *State* v. *Joyce*, supra, 243 Conn 301. We conclude that such a reasonable probability does not exist here. Here, although the cotton swabs were consumed, the genetic material obtained from the swabs was available to the defendant for further testing. The record does not indicate, nor does the defendant contend, that he ever sought to test further the genetic samples obtained from the crime scene. Furthermore, the absence of the swabs was not material because the defendant's theory of defense at trial was not that the results of the testing were wrong or that the testing was not properly performed; rather, he contended that the urine samples, from which the DNA profile was created, were not deposited on the night in question and that they could have been deposited earlier when he was in the house as an invited guest of Gardner. Yang acknowledged that there is no way to determine the time frame for which certain DNA evidence is deposited. This temporal issue, however, does not go to the admissibility of the DNA evidence but, rather, presents a question for the jury as to how much weight to give that evidence, which brings us to the next *Asherman* factor.[2]

---

[2] Because the defendant has failed to establish materiality, we need not examine the other *Asherman* factors. We do so briefly, however, for the sake of completeness.

The second *Asherman* factor requires consideration of the likelihood of mistaken interpretation of the evidence by witnesses or the jury. The likelihood of such a misinterpretation can be minimized at the trial by permitting testimony on the issue. *State* v. *Jones*, 50 Conn. App. 338, 357, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999). Here, the jury heard testimony that the defendant was acquainted with Gardner and had, therefore, previously visited Julian's home. The jury also heard testimony from Yang that it was impossible to determine the point in time that the DNA evidence in this case was deposited. On the basis of the clear evidence that the DNA sample could have been deposited by the defendant on a night other than that on which the crime took place, it is not likely that the jury was misled but, rather, was free to determine how much weight it would give that evidence.

"In weighing the third *Asherman* factor, the reason for the unavailability of the evidence, our cases have focused on the motives behind the destruction of the evidence. . . . In examining the motives . . . our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights." (Citations omitted; internal quotation marks omitted.) Id., 358. The record in this case does not disclose any evidence that the state was motivated by bad faith or improper motive in consuming both swabs. At the time the testing was done, the defendant was not a suspect in this case. Indeed, there were no suspects at that juncture. The record does not disclose any effort to suppress the evidence from the defendant but only that both swabs were needed in their entirety to compile a DNA profile.

Finally, in applying the fourth *Asherman* factor, we must consider the prejudice to the defendant caused by the unavailability of the swabs. See *State* v. *Jones*, supra, 50 Conn. App. 359. As noted, the genetic samples obtained from the swabs were available to the defendant for further testing. The defendant could have retained an expert to test the samples, but he did not avail himself of that opportunity. Additionally, because it was not possible to determine when the samples were deposited at the crime scene, we have no basis for believing that further testing likely could have advanced the defendant's argument that the genetic material was left on a night prior to the incident in question. Accordingly, any prejudice to the defendant in this case was insubstantial.

In light of the foregoing, we conclude that the defendant's state constitutional right to due process was not violated by the state's consumption of the cotton swabs that were used to collect the genetic samples to compile the DNA evidence in this case.

II

The defendant next claims that the court improperly declined to give the jury his requested instruction regarding the DNA evidence presented by the state. Specifically, the defendant contends that the court should have given a specific instruction regarding the DNA evidence due to its "scientific and hypersensitive nature" and the consequential need for guidance in considering that evidence. We disagree.

At trial, the defendant provided the court with proposed jury instructions, including an instruction regarding the DNA evidence.[3] During the charging conference,

---

[3] The defendant requested that the court charge as follows: "Forensic DNA testing rarely occurs [under] idyllic conditions. Crime scene DNA samples do not come from a single source obtained in immaculate conditions; they are messy assortments of multiple unknown persons, often collected in the most difficult conditions. The samples can be of poor quality due to exposure to heat, light, moisture, or other degrading elements. They

the court indicated that it was disinclined to give the requested instruction regarding DNA on the ground that it did not want to highlight any particular piece of evidence.

"When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *State* v. *Arroyo*, 292 Conn. 558, 566, 973 A.2d 1254 (2009), cert. denied, 559 U.S. 911, 130 S. Ct. 1296, 175 L. Ed. 2d 1086 (2010). In other words, "we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Dougherty*, 123 Conn. App. 872, 885, 3 A.3d 208, cert. denied, 299 Conn. 901, 10 A.3d 521 (2010). Additionally, "[w]hile a request to charge that is relevant to the issues in a case and that

can be of minimal or insufficient quantity, especially as investigators push DNA testing to its limits and seek profiles from a few cells retrieved from cigarette butts, envelopes, or soda cans. And most importantly, forensic samples often constitute a mixture of multiple persons, such that it is not clear whose profile is whose, or even how many profiles are in the sample at all. All of these factors make DNA testing in the forensic context far more subjective than simply reporting test results, accordingly, the circumstances surrounding the testing of DNA samples, as well as the testing itself must be subjected to scrutiny." The requested instruction was taken from *District Attorney's Office* v. *Osborne*, 557 U.S. 52, 81, 129 S. Ct. 2308, 174 L. Ed. 2d 38 (2009), which was quoted from a law review article.

accurately states the applicable law must be honored, a court need not tailor its charge to the precise letter of such a request. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 309–10, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). "To avoid the danger of improper influence on the jury, a recitation of the evidence should not be so drawn as to direct the attention of the jury too prominently to the facts in the testimony on one side of the case, while sinking out of view, or passing lightly over, portions of the testimony on the other side, which deserve equal attention." (Internal quotation marks omitted.) *State* v. *Luther*, 114 Conn. App. 799, 820, 971 A.2d 781, cert. denied, 293 Conn, 907, 978 A.2d 1112 (2009).

We find no fault with the trial court's conclusion that giving the requested instruction regarding DNA evidence risked highlighting that evidence. The court properly instructed the jury that it was the jury's role to determine the weight to give all the evidence during the deliberations, and the defendant has failed to demonstrate how the lack of a specific instruction regarding DNA evidence likely misled the jury. Furthermore, as we have discussed, the defendant's defense at trial was not that the DNA evidence was unreliable but that, having been a prior invited guest, he may well have deposited the urine on that occasion. Thus, we conclude that the court properly declined to give the defendant's requested instruction regarding DNA evidence.

### III

The defendant finally claims that the court improperly denied his motion for a new trial. The defendant asserts that the court should have granted his motion

because the state failed to disclose certain exculpatory evidence and the prosecutor made an inappropriate comment during closing argument.[4] We disagree.

"[T]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict and motion for a new trial . . . [is] the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . A verdict must stand if it is one that a jury reasonably could have returned and the trial court has accepted." (Internal quotation marks omitted.) *State* v. *Vazquez*, 119 Conn. App. 249, 252, 987 A.2d 1063 (2010). With these principles in mind, we address the defendant's arguments in turn.

A

The defendant claims that the state improperly failed to test or to produce certain fingerprint exemplars and a hair sample that were obtained from the crime scene and that this failure deprived him of exculpatory evidence. The following additional procedural background is pertinent to this claim. Prior to trial, the defendant filed a motion for discovery seeking a copy of the state's file, including the records of the state forensic laboratory. In response, the state provided the defendant with the DNA reports from the lab, but, during Kovanda's

---

[4] The defendant also claims that the court improperly coerced a witness to testify despite that witness' attempt to invoke his constitutional right not to testify pursuant to the fifth amendment to the United States constitution. Because the defendant did not raise this evidentiary issue before the trial court, it is not properly preserved, and we, therefore, decline to review it. See *State* v. *Outing*, 298 Conn. 34, 72, 3 A.3d 1 (2010).

testimony, the defendant discovered that the police had also retrieved fingerprints and a hair sample from the scene, neither of which was produced in response to the defendant's motion for discovery. Kovanda testified that the police obtained only one potential fingerprint that was sent to the laboratory for testing, which was determined as not having sufficient detail to be compared. He indicated that he did not send any other prints to the laboratory for testing because they were only partial, and he had determined that they were insufficient for testing. Kovanda testified that he did not send the hair sample to the laboratory for testing because, after magnified examination, he determined that it would not have been helpful because the sample did not include a hair root. Neither the partial prints nor the hair sample were provided to the defendant in response to his motion for discovery. On that basis, the defendant claims that his due process rights under the United States and Connecticut constitutions were violated.

The defendant claims that, by failing to produce the fingerprints and hair sample, the state suppressed exculpatory evidence in violation of *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). "In [*Brady*], the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. To establish a *Brady* violation, the defendant must show that (1) the government suppressed evidence, (2) the suppressed evidence was favorable to the defendant, and (3) it was material [either to guilt or to punishment]. . . .

"In order to obtain relief under *Brady*, a defendant bears the heavy burden of satisfying all three prongs of the aforementioned test. . . . Even if a defendant

is able to demonstrate that the government suppressed favorable evidence, he must still demonstrate that the evidence is material. The test for materiality is well established. Undisclosed exculpatory evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . Accordingly, we concentrate on the overall fairness of the trial and whether nondisclosure of the evidence was so unfair as to undermine our confidence in the jury's verdict." (Citations omitted; internal quotation marks omitted.) *State* v. *Garlington*, 122 Conn. App. 345, 357–58, 998 A.2d 1197, cert. denied, 298 Conn. 910, 4 A.3d 835 (2010).

On appeal, the defendant has failed to establish the exculpatory nature of the allegedly suppressed evidence. The defendant argues that the fingerprints and hair sample obtained from the crime scene "could have generated new suspects and [led] to further investigation that could [have] exculpate[d] the defendant." The defendant's argument, however, rests on no more than speculation. See *State* v. *Coleman*, 41 Conn. App. 255, 265–66, 675 A.2d 887 (1996) (speculation to assume that sample could have been tested for DNA matter), rev'd on other grounds, 242 Conn. 523, 700 A.2d 14 (1997); see also *State* v. *Morales*, 39 Conn. App. 617, 623–24, 667 A.2d 68 (speculation to assume tests could have been performed and whether such tests would have revealed scientifically useful evidence had jacket been preserved), cert. denied, 235 Conn. 938, 668 A.2d 376 (1995). There is no indication that production of the partial fingerprints or hair sample would have strengthened the defendant's case. See *State* v. *Harden*, 175 Conn. 315, 327, 398 A.2d 1169 (1978). The defendant

has failed to establish that the evidence was either favorable or material, and, therefore, his *Brady* claim must fail.

### B

The defendant claims that, during the rebuttal portion of the state's closing argument, the prosecutor improperly imputed to the defendant a theory of defense that he never pursued and was not based on the evidence, specifically that evidence had been " 'planted' " at the scene of the crime. The defendant contends that the state's improper remarks violated his due process rights. We are not persuaded.

Our Supreme Court previously has recognized that "a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . .

"The . . . determination of whether the defendant was deprived of his right to a fair trial . . . involve[s] the application of the factors set forth by [our Supreme Court] in *State* v. *Williams*, [supra, 204 Conn. 540]. As

[the court] stated in that case: In determining whether prosecutorial [impropriety] was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Reynolds*, 118 Conn. App. 278, 291–92, 983 A.2d 874 (2009), cert. denied, 294 Conn. 933, 987 A.2d 1029 (2010). "The absence of an objection at trial . . . [also] plays a significant role in the application of the *Williams* factors: When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . [Thus], the fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Internal quotation marks omitted.) *State* v. *Outing*, 298 Conn. 34, 82 n.23, 3 A.3d 1 (2010), cert. denied,      U.S.     , 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011).

Here, the defendant claims that the prosecutor made four unfounded references during the state's rebuttal closing argument that the defendant was contending that various evidence had been " 'planted.' "[5] Because

---

[5] Specifically, the prosecutor said: "You know what the underlying thing is? This is planted, created evidence. And you know where it falls apart? How do you plant evidence on someone when you don't even have a suspect named? He doesn't even know who the suspect is. . . . How is it all going to work if there's planted evidence back on August 11, 2004? . . . There is no way to create all of that.

\* \* \*

"Again, you can't plant evidence when you don't even have a suspect in mind.

the prosecutor's comments were made during rebuttal, the defendant complains that he did not get the opportunity to respond to the remarks, and he was consequently prejudiced. In response, the state argues that the prosecutor's comments during closing argument were induced by the defendant's closing argument during which he stressed that much of the forensic evidence obtained from the crime scene could not be definitively attributed to the defendant. Because the defense theory throughout trial had been that the defendant had likely deposited the DNA evidence when he was at the premises as an invited guest on a day prior to the crime, the argument advanced by the defendant that the evidence did not match him, the state argues, likely confused the prosecutor as he was hearing this defense for the first time.

Having reviewed the transcripts of the closing arguments of both parties, it is not clear to us that the prosecutor's remarks were in response to the defendant's closing argument. Assuming, arguendo, that the remarks were inappropriate,[6] we cannot conclude, however, that it is reasonably likely that the jury's verdict would have been different if the prosecutor had not made them. The remarks were not the central point of the prosecutor's closing argument; rather, they were cursorily made in the rebuttal portion of the argument. Although there were some references to evidence being planted or created, when viewed in the context of the entire trial, or even the prosecutor's entire argument, they were not so severe as to have infected the fairness of the proceeding. Additionally, the defendant did not object at the time the remarks were made, and he did not request that a curative instruction be given to the

* * *

"There's no creation of items. There's no creation of anything."

[6] Because we conclude that the defendant was not prejudiced by the remarks in question, we need not determine if they were improper.

jury. Thus, we can infer that the defendant did not find the remarks to be so prejudicial as to deprive him of a fair trial. Based on our assessment of the allegedly improper comments in the context of the entire trial, we cannot conclude that the defendant was denied his right to due process in this regard.[7]

On the basis of the foregoing, we conclude that the court did not abuse its discretion in denying the defendant's motion for a new trial.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[7] The defendant also claims that the prosecutor misrepresented Kovanda's testimony. Specifically, the defendant asserts that the prosecutor improperly said that: "[The defendant] made a comment about being at [Gardner's] house after he was under arrest and advised that it was for a robbery . . . ." Our review of the record reveals that the prosecutor may simply have misspoken or misconstrued Kovanda's testimony. To the extent that the prosecutor's representation of the evidence may not have been accurate, any error in this regard was cured by the court's instruction advising the jury that the arguments of counsel are not evidence and that the jury alone is the arbiter of the facts.