******************************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* FRANK
EDWARD BIGGS
(AC 38528)

Sheldon, Prescott and Bear, Js.

*Syllabus*

Convicted, following a jury trial, of the crimes of larceny in the second
degree, conspiracy to commit larceny in the second degree, larceny in
the third degree as an accessory, conspiracy to commit larceny in the
third degree, and engaging police in pursuit, and, following a plea of
nolo contendere, of being a persistent felony offender and a persistent
serious felony offender, the defendant appealed to this court. He claimed,
inter alia, that the trial court violated his right to an impartial jury
by failing to conduct an adequate investigation into a claim of juror
misconduct that he had brought to the court's attention on the date
originally scheduled for his sentencing. The claim involved an incident
in which a juror made a comment to H, the defendant's friend, about
the defendant's trial while the trial was ongoing, in violation of the
court's order to the jurors not to discuss the case with anyone. The trial
court conducted a preliminary inquiry into the claim but did not hold
an evidentiary hearing, as the defendant requested, to hear testimony
from the juror involved in the alleged misconduct because the court
found, on the basis of H's testimony during the preliminary inquiry, that
the defendant had not been prejudiced by the juror's conversation with
H, in which the juror indicated that the state's case against the defendant
was weak. *Held*:
1. The defendant could not prevail on his unpreserved claim that, pursuant
   to *Remmer* v. *United States* (347 U.S. 227), the trial court improperly
   failed to accord him a presumption that the juror's communication to
   H was prejudicial in determining whether the defendant met his burden
   of proving that he had been prejudiced by the juror's communication,
   there having been no constitutional violation; the defendant was not
   entitled to the *Remmer* presumption of prejudice, he having failed to
   prove that the court was implicated in the juror misconduct, or that
   there was an external interference with the jury's deliberative process
   via a private communication, contact or tampering with jurors that
   related directly to the case being tried.
2. The trial court did not abuse its discretion when it declined, after conduct-
   ing its preliminary inquiry into the defendant's claim of juror misconduct,
   to hold a further evidentiary hearing to receive the juror's testimony
   because it was persuaded by the evidence from its preliminary inquiry
   that the defendant had not been prejudiced by the juror's misconduct;
   the court properly determined, on the basis of H's testimony during the
   preliminary inquiry, that the juror's conversation with H was largely
   nonsubstantive and did not involve extrinsic information that might
   have interfered with the jury's deliberative process or caused the juror
   to develop an allegiance to either party.
3. The trial court violated the defendant's right against double jeopardy by
   sentencing him on separate charges of conspiracy to commit larceny
   in the second degree and conspiracy to commit larceny in the third
   degree, which both stemmed from a single, unlawful agreement to steal
   money from the victim; accordingly, the defendant's separate sentence
   and conviction of conspiracy to commit larceny in the third degree
   could not stand and had to be vacated.

Argued January 30—officially released September 26, 2017

*Procedural History*

Two part substitute information charging the defen-
dant, in the first part, with the crimes of larceny in the
second degree, conspiracy to commit larceny in the
second degree, larceny in the third degree, conspiracy
to commit larceny in the third degree and engaging

police in pursuit, and, in the second part, with being a persistent felony offender and a persistent serious felony offender, brought to the Superior Court in the judicial district of New Britain, geographical area number fifteen, where the first part of the information was tried to the jury before *Alander*, *J.*; verdict of guilty; thereafter, the defendant was presented to the court, *D'Addabbo*, *J.*, on a plea of nolo contendere to the second part of the information; judgment of guilty; subsequently, the court, *Alander*, *J.*, denied the defendant's motion for a hearing regarding allegations of juror misconduct and rendered judgment in accordance with the verdict and plea, from which the defendant appealed to this court. *Reversed in part; judgment directed.*

*David B. Bachman*, assigned counsel, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Brian Preleski*, state's attorney, and, on the brief, *David Clifton*, assistant state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Frank Edward Biggs, appeals from the judgment of conviction rendered against him following a jury trial in the judicial district of New Britain on charges of larceny in the second degree as an accessory in violation of General Statutes §§ 53a-123 (a) (3)[1] and 53a-8 (a); conspiracy to commit larceny in the second degree in violation of General Statutes §§ 53a-48 (a) and 53a-123 (a) (3); larceny in the third degree as an accessory in violation of General Statutes §§ 53a-124 (a) (2)[2] and 53a-8 (a); conspiracy to commit larceny in the third degree in violation of General Statutes §§ 53a-48 (a) and 53a-124 (a) (2); and engaging police in pursuit in violation of General Statutes § 14-223 (b). After the jury returned its guilty verdict, the trial court found the defendant guilty on additional charges of being a persistent felony offender in violation of General Statutes (Rev. to 2011) § 53a-40 (f) and being a persistent serious felony offender in violation of General Statutes § 53a-40 (c), upon his plea of nolo contendere to those charges under a part B information. The defendant ultimately was given a separate sentence on each of the seven charges for a total effective term of nine years of incarceration followed by five years of special parole.[3]

The defendant claims on appeal that the court (1) abused its discretion and violated his right to an impartial jury by failing to conduct an adequate investigation as to a claim of juror misconduct that he brought to its attention on the date originally scheduled for his sentencing and (2) violated his constitutional right against double jeopardy by imposing separate sentences upon him on two counts of conspiracy that were based upon a single conspiratorial agreement. The state disputes the defendant's juror misconduct claim, contending that the court adequately investigated and properly disposed of that claim. It agrees with the defendant, however, that the court violated his right against double jeopardy by imposing separate sentences upon him on two counts of conspiracy that were based upon a single conspiratorial agreement. We agree with the state, and therefore we affirm the trial court's judgment on all charges except for conspiracy to commit larceny in the third degree, and remand this case to the court with direction that the defendant's sentence and resulting conviction on that charge be vacated pursuant to *State* v. *Polanco*, 308 Conn. 242, 259–60, 61 A.3d 1084 (2013).

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts. During the early afternoon of August 27, 2011, James Peterson, the eighty-eight year old uncle of the owner of Hooters Restaurant in Wethersfield, transported two bags of daily proceeds from Hooters to the TD Bank in Berlin to make a cash deposit in the amount of $7242. In the parking lot outside of the bank, Peterson encoun-

tered and briefly chatted with a friend, Dean Clemens. After their conversation was over, and while Clemens was returning to his truck, he saw a man in the entrance to the bank grab the deposit bags in from Peterson and run away. Peterson first screamed at the man, who ran north, around the bank, and then cut through the neighboring Dunkin' Donuts parking lot. Thereafter, while attempting to follow the man in his truck, Clemens saw the man enter the passenger side of a newer black or dark blue Cadillac in the parking lot adjacent to the Dunkin' Donuts parking lot. As soon as the man entered the Cadillac, Clemens saw it speed out of the parking lot and turn east onto Farmington Avenue. Due to traffic in the bank parking lot, Clemens was initially unable to follow the Cadillac directly. He did, however, immediately notify the local police of what he had just seen by calling 911. Clemens told the 911 operator that there had been a "bank robbery" at the TD Bank and he was then pursuing the robbers' getaway vehicle. After accelerating to catch up to the Cadillac, he eventually was able to see its license plate number, which he relayed to the 911 operator. The license plate was registered to Whitney L. Johnson of Hamden. When Clemens was stopped behind the Cadillac at a stop light, he saw someone sit up in its backseat. He also noticed that the driver of the Cadillac was wearing a Boston Red Sox hat. After police officers joined in the pursuit of the Cadillac, Clemens returned to the bank and gave a statement to the officers from the Berlin Police Department who had responded to that location after the incident occurred.

Kelly Waas was getting coffee at the Dunkin' Donuts next to TD Bank when the incident occurred. While seated in her car in the drive-through lane, she saw a dark Cadillac driving back and forth in the adjacent parking lot. She noticed that the driver of the Cadillac was a black man with a husky build who was wearing a red baseball cap. She then saw a young black man run past her car and get into the rear passenger seat of the Cadillac, after which the Cadillac "took off like a bullet." Waas also reported her observations to the Berlin police officers who had responded to the bank after the incident was reported.

Also on the morning of the incident, patrol Officer Eric Chase of the Berlin Police Department was on duty in his marked police cruiser when his dispatcher radioed a "BOLO"[4] for a Cadillac that had reportedly been involved in a "robbery" at TD Bank. Recalling that a Cadillac matching the dispatcher's description had just passed him as he was driving southbound on the Berlin Turnpike, Chase accelerated to overtake the Cadillac, and eventually was able to maneuver his cruiser behind it so he could see its license plate. By so doing, he was able to confirm that it was the Cadillac described in the BOLO. He then activated his lights and siren in an unsuccessful attempt to pull over the

Cadillac.

As Chase's pursuit continued, other officers were setting up emergency operations at a firehouse farther south along the Berlin Turnpike in advance of an impending hurricane. When Lieutenant James Gosselin, a member of the hurricane response team, heard the broadcast about the fleeing Cadillac, he maneuvered his vehicle across the southbound lanes of the highway in an effort to stop it. To get around the vehicle, however, the operator of the Cadillac drove over the right curb of the highway, across the grass, and around some vehicles stopped at a nearby intersection. Chase initially followed the Cadillac around the vehicle and continued to pursue it southbound on the Berlin Turnpike, reporting as he did so that there appeared to be two people in the vehicle, one in the driver's seat and the other in the front passenger's seat. He ended his pursuit, however, at the Meriden city line because by then he could no longer see the Cadillac.

Later on the day of the incident, Hamden police officers went to the address of Johnson, the registered owner of the Cadillac, who was then the defendant's fiancée. Johnson told the police officers that the defendant had been using the Cadillac that day, and that he in fact had been using it throughout the month of August, 2011. Johnson stated that her brother had called her earlier in the day when police officers first went to her residence to inquire about the Cadillac. During that call, her brother had told her that the police were investigating a vehicle that had been involved in the commission of a crime. Johnson then called the defendant and informed him that the police were at her residence looking for the Cadillac. Sounding upset, the defendant then told Johnson that he, too, was looking for the Cadillac because it had been stolen from him earlier. The day of the incident was to have been the day of Johnson's and the defendant's wedding shower. When Johnson asked the defendant over the telephone what he was going to do about the shower, the defendant replied that he would not be coming to the shower. When Johnson later asked him about their wedding plans, moreover, he told her that the wedding would not be taking place, and, in fact, that he was unsure if or when she would ever see him again.

A couple of days later, Chase was dispatched to Meriden to investigate an abandoned motor vehicle. Upon his arrival, Chase recognized the vehicle from its license plate as the Cadillac he had pursued on the Berlin Turnpike after hearing the report of its use in a bank robbery. He took photographs of the Cadillac, including one of its untampered-with locking mechanism to show that a key must have been used to start and stop the vehicle. The Cadillac was then towed to the Berlin Police Department, where it was searched pursuant to a warrant.

The search of the Cadillac led to the discovery of the defendant's driver's license, along with receipts from an AutoZone store in Hamden and a Dunkin' Donuts in Wethersfield. The receipt from Dunkin' Donuts was dated about one-half hour before the start of the incident at TD Bank, and the contents of the cup found in the vehicle matched the order of coffee that was documented on the Dunkin' Donuts receipt. Police subsequently examined surveillance videos from AutoZone and Dunkin' Donuts from the morning of the incident, which showed the defendant, wearing a Boston Red Sox hat, making purchases in both establishments. The surveillance video from AutoZone also showed the blue Cadillac the defendant was reportedly driving on the day of the incident.

Steven Kostka, a Berlin police officer assigned to the investigation, later interviewed Johnson again. In this second interview, Johnson told Kostka that the defendant had told her that the Cadillac was stolen on the night before the incident. The defendant later contacted Kostka on November 9, 2011, after Kostka had left him a message explaining that an active warrant was out for his arrest in connection with the incident. The defendant told Kostka that he would turn himself in to the police once his finances were in order. The defendant, however, never turned himself in, and on January 17, 2012, more than two months after he called Kostka, he was arrested. Additional facts will be set forth as necessary.

I

INVESTIGATION OF JUROR MISCONDUCT

The defendant's first claim on appeal is that the court abused its discretion and violated his right to an impartial jury by failing to conduct an adequate investigation of a claim of juror misconduct that he brought to the court's attention on the date originally scheduled for his sentencing. The following additional facts are necessary for our resolution of that claim.

On October 24, 2014, when the defendant appeared in court for sentencing, defense counsel presented the court with a notarized statement from one of the defendant's friends, Darcy Hudson-Monroe, who averred that on the second day of trial, while she was waiting outside the New Britain Superior courthouse before entering for the morning session, she "ran into" and had a brief conversation with a one of her former coworkers, A.S.,[5] who was then serving on the defendant's jury. The affidavit stated that after Hudson-Monroe and A.S. greeted one another and asked each other what they were doing at the courthouse, Hudson-Monroe told A.S. that she was there "waiting for my friend [the defendant because] he is on trial today." A.S. reportedly responded to that statement by saying that he was there serving as a juror in that case. Hudson-Monroe then asked A.S.

how the case was going. He responded that " '[t]hey have no real hard evidence against him.' " Hudson-Monroe ended their conversation by remarking, " 'that's good so you should not be doing jury duty for any length of time.' " They then said goodbye to one another and went separately into the courthouse.

After reviewing the affidavit, the court stated that it was required by law to make a preliminary inquiry into the defendant's claim of juror misconduct. Defense counsel informed the court that, in anticipation of such an inquiry, he had told Hudson-Monroe that she might have to testify about her statement. By the time the court was ready to hear from her, however, Hudson-Monroe had left the courthouse.

Later that day, with Hudson-Monroe still absent from the courthouse, the court determined that if her affidavit was true, then A.S. had engaged in misconduct by speaking with her about the case because he had been instructed on several occasions not to discuss the case with anyone. Even so, the court noted that A.S.'s reported statement that " '[t]hey have no real hard evidence against him' " was essentially accurate because by that point in the trial, only circumstantial evidence had been presented.

The court then stated that the law governing claims of juror misconduct was set forth in *State* v. *Bozelko*, 119 Conn. App. 483, 494, 987 A.2d 1102, cert. denied, 295 Conn. 916, 990 A.2d 867 (2010), cert. denied, U.S. , 134 S. Ct. 1314, 188 L. Ed. 2d 331 (2014), which held that when the court itself is not responsible for alleged juror misconduct, the defendant bears the burden of proving that actual prejudice resulted from such misconduct. It thus asked defense counsel to specify what prejudice had resulted from the misconduct he had reported. Although counsel initially responded that he could not identify any such prejudice, he suggested that he might be able to establish prejudice through Hudson-Monroe's live testimony. At the same time, however, defense counsel conceded that he had no evidence of juror misconduct or resulting prejudice to the defendant's right to a fair trial other than that described in Hudson-Monroe's affidavit.

Although the court noted that it could not presume that there was further evidence of prejudice, it gave the defendant several days to bring Hudson-Monroe before the court to testify. When defense counsel asked if the court also planned to call the offending juror, A.S., into court to testify, the court stated that it had no such plan at that time because it first needed to hear from Hudson-Monroe to determine if her statement was credible, and then, if her statement was found to be credible, it would determine, in light of her testimony, whether there was any need for the juror's testimony as well.

On October 29, 2014, Hudson-Monroe returned to court to testify about the substance of her statement. In her testimony on direct examination, the following exchange occurred between her and defense counsel:

"Q. All right, Ms. [Hudson-Monroe], do you know [the defendant]?

"A. Yes, I do. . . .

"Q. And prior to this trial, did you know [the defendant]?

"A. Yes.

"Q. And how is it you know [the defendant]?

"A. [The defendant] and I used to date about twenty years ago.

"Q. And have you kept in touch with him on and off since then?

"A. Somewhat.

"Q. Can you tell me a little about yourself? Are you employed?

"A. I'm retired.

"Q. Okay. And what are you retired from?

"A. Corrections.

"Q. Corrections with what state?

"A. Connecticut.

"Q. How long did you work for corrections?

"A. Almost twenty-one years.

"Q. And during the course of that employment with the state, Department of Correction, did you get to know an [A.S.]?

"A. Yes. . . .

"Q. And did you ever work with [A.S.]?

"A. Yes, I did.

"Q. And can you tell me approximately how long you worked with him?

"A. Maybe nine or ten years.

"Q. And did there come a time that you ran into [A.S.] in this courthouse?

"A. Outside.

"Q. Will you tell me approximately when that occurred?

"A. Um, August, I can't remember the date. I know it was a date that [the defendant] was coming to find out if he was guilty or not. I just don't remember the date.

"Q. So, you ran into [A.S.].

"A. Yes, I did.

"The Court: When you say outside, do you mean outside the courthouse?

"The Witness: Yes, sir.

"The Court: Okay.

"Q. Can you tell me what happened—

"A. Sure.

"Q. —outside the courthouse?

"A. Okay. I was sitting outside with my grandson, and I saw [A.S.] coming up and I got up to go, you know, greet him, because I haven't seen him in four years. I've been retired now for four years. So, we walked up to one another, gave one another a brief embrace and asked both at the same time, what are you doing here? And I said, oh, my friend is in court. My friend, [the defendant], is in court. And he said, oh, I'm on duty, I have jury duty. I said, oh, I said, well, how is it going? He said, oh, well, it's not going too bad. They don't have much evidence on him. And I said, okay, so you shouldn't be here long. He said, no, not really, but you never know. And I said, okay, good to see you, and I introduced him to my grandson, we gave a brief embrace, I went and sat back down, waited for [the defendant] to come into court, and he came into the courthouse and that's it.

"Q. Now, when you met [A.S.]—

"A. Um-hum.

"Q. —did you indicate you were here for [the defendant]?

"A. Yeah, I said my friend, [the defendant].

"Q. And did he indicate what trial he was sitting as a juror on?

"A. No, he didn't.

"Q. Now, your statement is slightly different from that statement.

"The Court: Here it is.

"A. Okay. . . .

"Q. In that statement, didn't you indicate that he told you he was a juror on [the defendant's] case?

"A. He said he was a juror on a case. I don't remember—

"Q. On that case?

"A. I don't remember if it was that case. All I know he's saying he's a juror on the case. . . .

"Q. —you, I believe in your statement, you said, shortly thereafter we said our goodbyes and proceeded in the courthouse.

"A. Correct.

"Q. And did you talk about anything else with respect to this case with [A.S.]?

"A. Absolutely not. I stayed outside with my grandson, and he came on inside.

"Q. And did you see him in the courthouse at all after that encounter outside?

"A. No, I didn't. When I came in, I sat on the right-hand side and only stayed for about a half an hour. But no jurors were in here when we came in.

"Q. And by the time you left, had any jurors come in?

"A. I don't—oh, no. By the time I left, no. The other one in here was you, [the defendant], and the gentleman sitting here and the sheriffs and myself."

Thereafter, on the state's cross-examination of her, Hudson-Monroe further testified about her encounter with A.S. as follows:

"Q. Okay. When you were talking about the meeting outside on the steps of the courthouse—

"A. Um-hum, okay.

"Q. —do you remember about when that was?

"A. I don't remember the day. Like I said, the date— I know it was August, a day that [the defendant] had to come to court because he was finding out if he was going to be guilty or not, and I don't remember that date.

"Q. But do you remember, was it in the afternoon? Was it in the morning?

"A. I came in the morning because I have school, so I came in the morning.

"Q. Okay. And you said you got here—well, do you know when you got here?

"A. Um, about 9:15ish.

"Q. Okay. And how long had you been here before you ran into [A.S.]?

"A. I'm not sure. Maybe a little before ten or so.

"Q. Okay. So, just before ten o'clock is when you met him?

"A. Yeah.

"Q. And about how much time passed between when you first met him and when you parted ways?

"A. How much time passed, maybe three minutes or so. . . .

"Q. Now, to go to the conversation that you had, was it cordial?

"A. Oh, yeah.

"Q. It was just two friends that met after—

"A. Absolutely. Absolutely.

"Q. —about four years, you said?

"A. Yes, I've been retired for four years."

At the conclusion of Hudson-Monroe's testimony, defense counsel requested the court's permission to subpoena A.S. The court responded that even if it accepted Hudson-Monroe's testimony as true, and found on that basis that A.S. had violated its orders not to discuss the case with anyone, the defendant was still required by law to prove that he had been prejudiced by such misconduct before the juror would be called in to testify about the incident.

Counsel argued that the defendant may have been prejudiced if he was found guilty "by a less than impartial jury, and I think that we have enough information right now to raise that red flag to have him come in and testify whether he did or didn't." He conceded again, however, in response to the court's specific question on the subject, "that there's nothing about the conversation that [the juror] may have had with [Hudson-Monroe] that is prejudicial." Counsel concluded by arguing that, on the facts of this case, the court was required to hear testimony from the juror as part of its preliminary inquiry as to his alleged misconduct under the authority of *State* v. *Brown*, 235 Conn. 502, 519, 526, 668 A.2d 1288 (1995) (requiring court to conduct sua sponte preliminary inquiry as to juror misconduct in exceptional circumstance where court received anonymous letter detailing juror's public divulgence of highly prejudicial information).

The state responded to this argument by noting that *Brown* did not require a full evidentiary hearing as to every allegation of juror misconduct, but only an initial inquiry to determine if a full hearing was necessary. Here, it insisted, the court already had conducted a proper initial inquiry as to the defendant's allegation that clearly demonstrated that no further inquiry was necessary because the juror's reported statement to Hudson-Monroe evidenced only his opinion that the state's case against the defendant was weak, which could not have prejudiced the defendant, and that defense counsel himself had conceded that no identifiable prejudice had resulted from the making of that statement. The state concluded by arguing that even if the juror was called to testify about the juror's alleged misconduct, he could not shed much light on the issue of prejudice during jury deliberations because he would not be permitted to testify as to how his encounter with Hudson-Monroe had affected either his or his fellow jurors' decision-making process.

After hearing these arguments, the court ruled that, even if Hudson-Monroe's testimony was accepted as

true,[6] the defendant had failed to show that any actual prejudice had resulted from her conversation with A.S., and thus he was not entitled to an evidentiary hearing at which A.S. would be called as a witness. It reasoned that because A.S.'s statement that " '[t]hey have no real hard evidence against him' " was the extent of his comments about this case, there was no evidence that Hudson-Monroe had attempted to influence A.S., or that A.S. had received any extrajudicial information about the case. Thus, the court explained that, although any communication between a juror and a nonjuror that conveyed extrajudicial information could potentially be so prejudicial to the defendant's fair trial rights as to warrant a further evidentiary inquiry, no such further inquiry was required here because no such improper communication had taken place. In the end, the court concluded that the testimony of Hudson-Monroe as to her brief encounter with A.S. had given it a sufficient basis for concluding that the defendant had not been prejudiced by that encounter because it confirmed that there had not been "some other conversation beyond what she indicated in her affidavit . . . ."

Against this background, the defendant claims that the court abused its discretion and violated his right to an impartial jury by failing to conduct an adequate investigation of his claim of juror misconduct. On this score, the defendant argues, more particularly, that the court (1) erred by failing to presume that he had been prejudiced by the offending juror's improper conversation about the case with Hudson-Monroe, and then by failing and refusing, in the absence of affirmative proof of prejudice, to permit the juror to testify to determine if, by his misconduct, he had violated the defendant's right to a fair trial; and (2) thereafter abused its discretion by denying the defendant's request to subpoena the juror to testify about his improper conversation with Hudson-Monroe and its possible consequences.

"[W]hen reviewing claims of juror misconduct on appeal we recognize that the trial court has wide latitude in fashioning the proper response to allegations of juror [misconduct]. . . . We [therefore] have limited our role, on appeal, to a consideration of whether the trial court's review of alleged jur[or] misconduct can fairly be characterized as an abuse of its discretion." (Internal quotation marks omitted.) *State* v. *Roman*, 320 Conn. 400, 409, 133 A.3d 441 (2016); id., 411 (holding denial of defendant's request for new trial not abuse of discretion because defendant could not demonstrate juror misconduct).

"Under the constitution of Connecticut, article first, § 8, and the sixth amendment to the United States constitution, the right to a trial by jury guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . In cases where a defendant alleges juror bias or misconduct, the defendant may be

entitled to a new trial if he can raise his allegations from the realm of speculation to the realm of fact. . . . In such cases, we ask whether or not the [jury] misconduct has prejudiced the defendant to the extent that he has not received a fair trial." (Citations omitted; internal quotation marks omitted.) Id., 408.

"[A] defendant has been prejudiced if the misbehavior is such to make it probable that the juror's mind was influenced by it so as to render him or her an unfair and prejudicial juror. . . . We observe that, in accordance with the well settled limitation on inquiring into the mental processes of jurors; *State* v. *Johnson*, 288 Conn. 236, 261, 951 A.2d 1257 (2008); this inquiry does not involve an inquiry concerning the *actual* effect of any misconduct upon one or more jurors." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Anderson*, 163 Conn. App. 783, 794, 134 A.3d 741, cert. denied, 321 Conn. 909, 138 A.3d 931 (2016).

In *Remmer* v. *United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 98 L. Ed. 654 (1954), the United States Supreme Court declared that "[i]n a criminal case, *any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial,* if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. *The presumption is not conclusive, but the burden rests heavily upon the [g]overnment to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.*" (Emphasis added.) The defendant now argues, for the first time on appeal, that the trial court erred in failing to accord him the benefit of the *Remmer* presumption when determining if he had met his burden of proving that he had been prejudiced by A.S.'s private communication with Hudson-Monroe during his trial. The defendant raises this claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). Under this standard, "[a defendant] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original; internal quotation marks omitted.) *In re Raymond B.*, 166 Conn. App. 856, 864, 142 A.3d 475 (2016). We find that the defendant's claim is reviewable because the record is adequate for our review and the

claim is of constitutional magnitude. The defendant's claim, however, fails on the merits because we hold, as further discussed, that there is no violation of constitutional law.

The United States Supreme Court later discussed the *Remmer* presumption in two cases, *Smith* v. *Phillips*, 455 U.S. 209, 212, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982), and *United States* v. *Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993), and some courts have interpreted both to restrict the *Remmer* presumption, if not to eliminate it entirely. In *Smith*, the Supreme Court explained that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. . . . Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* . . . ." *Smith* v. *Phillips*, supra, 217. In *Olano*, the Supreme Court echoed its holding in *Smith* that due process does not require a new trial in every instance of juror misconduct, and added, importantly, that there are some instances of juror misconduct in which a presumption of prejudice may not apply. *United States* v. *Olano*, supra, 739 (holding that mere presence of alternate jurors during jury deliberations did not entail sufficient risk of "chilling" deliberations to justify presumption of prejudice). The court in *Olano* thus concluded that, while the misconduct at issue in *Remmer*, involving the attempted bribery of a juror, was appropriately presumed to be prejudicial, other outside intrusions upon the jury required proof of prejudicial impact on the defendant's right to a fair trial. Id.

In light of these authorities, our Supreme Court discussed the viability of the *Remmer* presumption in *State* v. *Berrios*, 320 Conn. 265, 129 A.3d 696 (2016), where it held that the "*Remmer* presumption is still good law with respect to external interference with the jury's deliberative process via private communication, contact, or tampering with jurors that relates directly to the matter being tried." (Footnote omitted.) Id., 292. As to misconduct of that sort, the court in *Berrios* held that the burden rests on the state to prove that such misconduct was harmless, although it emphasized that the burden remains on the defendant to make a prima facie showing as to his entitlement to the presumption. Id., 293.

"It is well settled that if the trial court is directly implicated in juror misconduct, the state bears the burden of proving that misconduct was harmless error. . . . If, however, the trial court is not at fault for the alleged juror misconduct, we have repeatedly held that *a defendant who offers proof of juror misconduct bears*

*the burden of proving that actual prejudice resulted from the misconduct.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Roman*, supra, 320 Conn. 408–409; see also *State* v. *Anderson*, supra, 163 Conn. App. 793–94 (under *Berrios*, "unless a defendant can prove, rather than merely speculate, that the court was directly implicated in juror misconduct or that there was external interference with the jury's deliberative process via private communication, contact, or tampering with jurors that relates directly to the matter being tried . . . a defendant cannot demonstrate an entitlement to a presumption of prejudice, but bears the burden of demonstrating prejudice as a result of the alleged misconduct" [citation omitted; internal quotation marks omitted]).

Our Supreme Court in *State* v. *Brown*, supra, 235 Conn. 526–28, instructed that "a trial court *must conduct a preliminary inquiry*, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. *Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to allegations of jury misconduct. That form and scope may vary from a preliminary inquiry of counsel, at one end of the spectrum, to a full evidentiary hearing at the other end of the spectrum, and, of course, all points in between.* Whether a preliminary inquiry of counsel, or some other limited form of proceeding, will lead to further, more extensive, proceedings will depend on what is disclosed during the initial limited proceedings and on the exercise of the trial court's sound discretion with respect thereto. . . .

"We recognize that the trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided . . . and thus is in a superior position to evaluate the credibility of allegations of jury misconduct, whatever their source. *There may well be cases, therefore, in which the trial court will rightfully be persuaded, solely on the basis of the allegations before it and the preliminary inquiry of counsel on the record, that such allegations lack any merit. In such cases, a defendant's constitutional rights may not be violated by the trial court's failure to hold an evidentiary hearing,* in the absence of a timely request by counsel." (Citations omitted; emphasis added; footnote omitted.) Id.

Our Supreme Court in *Brown* further explained that "[o]ur requirement that any allegations of jury misconduct necessitate some type of preliminary inquiry still leaves the form and scope of such an inquiry to be determined by the trial court within the exercise of its discretion. . . . In the proper circumstances, the trial court may discharge its obligation simply by notifying the defendant and the state of the allegations, providing

them with an adequate opportunity to respond and stating on the record its reasons for the limited form and scope of the proceedings held. In other circumstances, the trial court itself may need to cause an investigation of the allegations of jury misconduct to be conducted through informal or formal means. If the trial court determines that a proper assessment of allegations requires an evidentiary hearing, it possesses wide discretion in deciding how to pursue an inquiry into the nature and effect of information that comes to a juror improperly as well as its potential effect upon the jury if it learns of it." (Citations omitted; internal quotation marks omitted.) Id., 529.

When a trial court exercises its discretion as to the form and scope of an inquiry into allegations of juror misconduct, it "should honor the defendant's request [for a minimal type of proceeding], unless the court is persuaded that other factors warrant a more extensive inquiry. . . . *In contrast, although the defendant can request an evidentiary hearing, the trial court should not hold such a proceeding if it is persuaded that a less extensive inquiry is more appropriate in light of all the circumstances.*" (Emphasis added.) Id., 530. It should also consider the seriousness of the allegation by taking into account "the prejudicial nature of the alleged misconduct as well as the nature and degree of the jury's alleged involvement in the misconduct." Id., 531. *Brown* also advises that, when exercising its discretion as to how to proceed with a claim of juror misconduct, a court should credit the government's interest in the finality of judgments, protecting the privacy and integrity of jury deliberations, preventing juror harassment, and maintaining public confidence in the jury system. Id., 529–31.

Applying those well settled legal principles to the present case, we conclude that, although the defendant is correct that a *Remmer* presumption of prejudice applies in certain circumstances, he failed to prove that he was entitled to such a presumption here.

The mere introduction of evidence of juror misconduct, even if proven true, does not entitle a defendant to a *Remmer* presumption of prejudice. Under *Remmer*, prejudice is not presumed unless the court is implicated in the alleged conduct, or there was an external interference with the jury's deliberative process via private communication, contact, or tampering with jurors that relates directly to the matter being tried. *State* v. *Anderson*, supra, 163 Conn. App. 793. The defendant has proved neither.

The court exercised its broad discretion to select an appropriate method for investigating and evaluating the defendant's claim of juror misconduct. See *State* v. *Brown*, supra, 235 Conn. 526–28. After receiving Hudson-Monroe's notarized statement, it determined that, if the allegations within it were true, then juror miscon-

duct had occurred. Therefore, it scheduled an evidentiary hearing to investigate the nature of the reported misconduct by allowing the defendant to call Hudson-Monroe to testify. Because the court itself was not implicated in the alleged misconduct, the defendant could have proved that he was entitled to a presumption of prejudice only if he demonstrated that the communication at issue constituted an external interference with the jury's deliberative process via private communication, contact, or tampering with jurors that relates directly to the matter being tried. See *State* v. *Berrios*, supra, 320 Conn. 292; *State* v. *Anderson*, supra, 163 Conn. App. 793. He failed to do so.

Although the complained-of conversation related directly to the matter being tried, the court determined, and the defendant conceded, that A.S.'s statement to Hudson-Monroe that " '[t]hey have no real hard evidence against him' " was not in any way an interference with the jury's deliberative process. The court found that Hudson-Monroe's testimony confirmed the essence of her notarized statement and thus added nothing to that statement tending to indicate that she had made any attempt to influence A.S. It further found that A.S. was not thereby given, nor did he receive, any extrajudicial information about the case, and that nothing about the conversation threatened A.S.'s ability to decide the case fairly and impartially, based solely upon the evidence presented at trial. No further inquiry was required here because no such improper communication had taken place that rose to the level of constituting an external interference.

We conclude that the court properly determined that the communication between Hudson-Monroe and A.S. was largely nonsubstantive and did not introduce extrinsic information of any kind, let alone that which might either have interfered with the jury's deliberative process or caused A.S. to develop an allegiance to either party.[7] See *State* v. *Roman*, supra, 320 Conn. 410–11. As such, the court did not abuse its discretion when, upon hearing testimony from Hudson-Monroe in the course of its initial inquiry into A.S.'s misconduct, it declined to hold a further evidentiary hearing to receive A.S.'s testimony about his misconduct, even after the defendant requested such a hearing, because it was persuaded by the evidence before it that its own lesser inquiry had established adequately that the defendant had not been prejudiced by such misconduct. See *State* v. *Brown*, supra, 235 Conn. 526.

## II

## DOUBLE JEOPARDY CLAIM

The defendant next claims that the court erred when it violated his right against double jeopardy by sentencing him separately on two counts of conspiracy that were based upon the same conspiratorial agreement.

Specifically, he argues that the trial court committed plain error when it rendered judgment and sentenced him on the charges of conspiracy to commit larceny in the second degree and conspiracy to commit larceny in the third degree because both of those counts stemmed from a single unlawful agreement to steal the deposit bags from Peterson. The state concedes that there was only one conspiracy, the agreement to commit larceny, and therefore that the conviction on the two conspiracy counts constitutes a violation of the defendant's right against double jeopardy. We agree and conclude that vacatur is the appropriate remedy for the double jeopardy violation resulting from the defendant's conviction of two counts of conspiracy that were based upon a single conspiratorial agreement.

The defendant acknowledges that he failed to raise the present claim before the trial court, but argues that the claim is reviewable on appeal under the plain error doctrine embodied in Practice Book § 60-5. Because, however, the defendant's claim is "based on a violation of the prohibition against double jeopardy afforded under the state and federal constitutions . . . the claim is reviewable under [*State* v. *Golding*, supra, 213 Conn. 239–40] because the record is adequate for review, and the claim is of constitutional magnitude. . . . The defendant claims that he received multiple punishments for the same offense in a single trial. A defendant may obtain review of a double jeopardy claim, even if it is unpreserved, if he has received two punishments for two crimes, which he claims were one crime, arising from the same transaction and prosecuted at one trial . . . . Because the claim presents an issue of law, our review is plenary." (Citations omitted; internal quotation marks omitted.) *State* v. *Urbanowski*, 163 Conn. App. 377, 386–87, 136 A.3d 236, cert. granted on other grounds, 321 Conn. 905, 138 A.3d 280 (2016).

"The double jeopardy clause of the fifth amendment to the United States constitution provides that no person shall be subject for the same offense to be twice put in jeopardy of life or limb. This clause prohibits not only multiple trials for the same offense but also multiple punishment for the same offense. . . . Double jeopardy analysis in the context of a single trial is a two-step process. First, the charges must arise out of the same act or transaction. Second, it must be determined whether the charged crimes are the same offense. Multiple punishments are forbidden only if both conditions are met." (Internal quotation marks omitted.) *State* v. *Brown*, 132 Conn. App. 251, 255, 31 A.3d 434 (2011), cert. denied, 303 Conn. 922, 34 A.3d 396 (2012).

"A single agreement to commit several crimes constitutes one conspiracy. . . . [M]ultiple agreements to commit separate crimes constitute multiple conspiracies." (Internal quotation marks omitted.) *State* v. *Ellison*, 79 Conn. App. 591, 599, 830 A.2d 812, cert.

denied, 267 Conn. 901, 838 A.2d 211 (2003).

In the present case, the defendant was convicted and sentenced on separate charges of conspiracy to commit larceny in the second degree in violation of §§ 53a-48 (a) and 53a-123 (a) (3), and conspiracy to commit larceny in the third degree in violation of §§ 53a-48 (a) and 53a-124 (a) (2) that were based upon a single conspiratorial agreement. The state concedes that "[b]ased on [its] long form information and the evidence presented at trial, there was only one unlawful agreement," which was the agreement to commit larceny of the deposit bags from Peterson. We conclude that the defendant's conviction of and sentencing on both the charge of conspiracy to commit larceny in the second degree and the charge of conspiracy to commit larceny in the third degree constitute multiple punishments for the same offense. Accordingly, as the state concedes, the third prong of *Golding* is met. Cf. *In re Raymond B.*, supra, 166 Conn. App. 864. Therefore, the defendant's separate sentence and resulting judgment of conviction on the count of conspiracy to commit larceny in the third degree must be reversed, and the case must be remanded to the trial court with direction to vacate the defendant's sentence and judgment of conviction on that charge. See *State* v. *Wright*, 320 Conn. 781, 829–30, 135 A.3d 1 (2016) (holding that vacatur, rather than merger, of two of three conspiracy counts based upon single conspiratorial agreement was proper remedy for defendant's multiple convictions in violation of his constitutional right against double jeopardy); see also *State* v. *Polanco*, supra, 308 Conn. 259–60.

The judgment is reversed only as to the conviction of conspiracy to commit larceny in the third degree and the case is remanded with direction to vacate the judgment as to that conviction; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] In relation to the count on larceny in the second degree, the long form information charged the defendant in relevant part "[with taking] property from the person of another, to wit: a deposit bag from the hands of John Peterson . . . ."

[2] In relation to the count on larceny in the third degree, the long form information charged the defendant in relevant part "[with taking] property valued over $2000, to wit: the other person physically taking the deposit bag containing money in the approximate amount of $7242 from John Peterson and the defendant driving that other person from the scene with the stolen property . . . ."

[3] The defendant was sentenced to a period of eight years of incarceration and five years of special parole for the crime of larceny in the second degree as enhanced by being a persistent felony offender; eight years of incarceration and five years of special parole, to run concurrently, for the crime of conspiracy to commit larceny in the second degree; four years of incarceration, to run concurrently, for the crime of larceny in the third degree as an accessory; four years concurrent for the crime of conspiracy to commit larceny in the third degree; and one year of incarceration, to run consecutively, for engaging police in pursuit.

[4] "BOLO" stands for "be on the lookout."

[5] In accordance with our usual practice, we identify jurors by initials in order to protect their privacy interests. See, e.g., *State* v. *Osimanti*, 299 Conn. 1, 30 n.28, 6 A.3d 790 (2010).

[6] The court noted that there was a discrepancy between Hudson-Monroe's written statement and her in-court testimony as to whether A.S. informed her that he was serving on the defendant's jury. The court ultimately dismissed that discrepancy as an unimportant detail.

[7] Although other trial courts have heard testimony from jurors accused of misconduct before rendering decisions as to whether juror misconduct occurred and thus prejudiced the defendant; see *State* v. *Anderson*, supra, 163 Conn. App. 786 (trial court held evidentiary hearing at which defendant presented testimony of her daughter, her son, and juror with whom her daughter allegedly interacted during trial); the court here was within its province to determine, in its fact specific inquiry, that such testimony was unnecessary in light of its preliminary inquiry.