******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

STATE OF CONNECTICUT *v.* DEVIN M.*
(AC 45999)

Alvord, Seeley and Palmer, Js.

*Syllabus*

Convicted of the crimes of sexual assault in the fourth degree and risk of injury to a child, the defendant appealed. He claimed, inter alia, that the trial court violated his right to due process under the state constitution when it denied his pretrial motion to dismiss the charges against him, in which he alleged that the police improperly failed to preserve and to collect certain evidence. *Held*:

The defendant's due process claim that the police failed to preserve the contents of a certain clothes hamper, which was predicated on his claim that the police failed to seize that hamper, failed as a matter of law, as the failure by the police to collect and preserve that evidence did not implicate the defendant's right to due process pursuant to *State* v. *Morales* (232 Conn. 707).

The defendant was not deprived of his state constitutional right to due process by the state's failure to preserve certain evidence, namely, two photographs, as all four factors of the balancing test set forth in *State* v. *Asherman* (193 Conn. 695) weighed against the defendant with respect to the lost photographs.

The trial court did not abuse its discretion by declining to engage in extensive inquiry into an allegation of juror misconduct, as the inquiry it conducted was adequate pursuant to *State* v. *Brown* (235 Conn. 502).

Argued September 17—officially released November 19, 2024

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the fourth degree and risk of injury to a child, brought to the Superior Court in the judicial district of Litchfield, geographical area number eighteen, where the court, *Pelosi, J.*, denied the defendant's motion to dismiss; thereafter, the case

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

was tried to the jury before *Pelosi, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Shanna P. Hugle*, deputy assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *David R. Shannon*, state's attorney, and *Terri L. Sonnemann*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SEELEY, J. The defendant, Devin M., appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (1) (A)[1] and risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that the trial court (1) violated his right to due process under article first, § 8, of the Connecticut constitution, when it denied his pretrial motion to dismiss the charges against him,[2] in which he alleged that the police improperly failed to preserve and to collect certain evidence relating to clothing recovered from the laundry hamper (hamper)[3] in the victim's bedroom, and (2) abused its discretion by failing to conduct additional inquiry into an allegation of juror misconduct. We disagree and, accordingly, affirm the judgment of the court.

---

[1] Although § 53a-73a was the subject of amendments in 2019 and 2023; see Public Acts 2019, No. 19-16, § 16; Public Acts 2019, No. 19-93, § 10; Public Acts 2023, No. 23-47, § 10; Public Acts 2023, No. 23-149, § 3; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

[2] As an alternative to dismissal, the defendant asked the court to suppress the evidence or to permit the jury to draw an adverse inference against the state for its failure to preserve evidence.

[3] The object at issue was referred to as a "hamper" and "laundry basket" by different parties throughout the proceedings. For consistency in this opinion, we refer to it as a hamper.

The jury reasonably could have found the following facts based on the evidence and testimony presented. In May, 2017, the defendant was a houseguest staying at the eleven year old victim's home in Thomaston, where she lived with her mother, her father and her older brother. The defendant's and the victim's families were close—the defendant was a close friend of the victim's brother, the defendant's mother was close friends with the victim's mother, and the families sometimes did activities together. The victim's parents had agreed to allow the defendant to stay with them, in the bedroom of the victim's brother, after the defendant was "kicked out" of his girlfriend's home. Late at night, on May 19, 2017, the defendant entered the victim's bedroom after everybody else in the house had gone to sleep. This woke the victim up, and the defendant told her to "shush," pulled down her pants and underwear, pulled down his pants, and then placed his penis near the crack of her buttocks. The defendant rubbed his penis on the victim's buttocks for a few minutes before leaving the victim's bedroom and going to the bedroom of the victim's brother, at which point the victim pulled her pants up, curled up in a ball in the corner of her bed for a time before she got up to change her clothes, placed the clothes she was wearing[4] into the hamper in her room, and then went to the living room, where her father was sleeping, to go back to sleep.

Approximately a week later, the victim disclosed being sexually assaulted for the first time, telling her best friend, J, that the defendant had come into her room in the middle of the night and rubbed his penis on her buttocks. J encouraged the victim to inform her brother about what happened, which she did on May 26, 2017. The victim's brother subsequently informed their mother about what the victim had told him. The

---

[4] The evidence established that the victim was wearing leggings and underwear at the time of the assault.

victim's mother called the victim's father to notify him, and, although they decided to wait until he got home from work to talk to the victim about it, the victim's mother "couldn't hold it in anymore" and questioned her alone. When asked, the victim told her mother that the defendant had come into her room and sexually assaulted her. Immediately after the victim made that statement, the victim's mother went to the home of the defendant's mother with the victim and informed the defendant's mother about what had happened. The defendant's mother then called the police. Around the time the police arrived at the home, the victim's father arrived with the victim's brother, and the victim was eventually transported by ambulance to Saint Mary's Hospital in Waterbury for a medical examination, at which her mother and father were present. At the hospital, the victim told hospital staff that the clothes she was wearing during the sexual assault were still in the hamper in her bedroom.

In the meantime, Detective Keith Koval of the Thomaston Police Department arrived at the home of the defendant's mother. He took a statement from the victim's brother and then spoke on the phone with the victim's father, who told Koval about the clothes in the hamper. Thereafter, Koval went to the victim's home, accompanied by the victim's brother and, with the consent of the victim's parents, entered the home to locate evidence of the sexual assault, namely, the leggings and underwear in the hamper in the victim's bedroom that she reported she was wearing at the time of the sexual assault. Koval found and collected the leggings and underwear from the hamper in the victim's bedroom, processed the evidence at the police department, and then brought the evidence to the state laboratory for forensic testing. He also collected a DNA sample from the victim and obtained a search warrant to collect DNA from the defendant.

At the state laboratory, forensic testing conducted on a "whitish stained area" found by a forensic examiner on the victim's underwear produced a positive reaction for semen, and a microscopic examination of the area revealed the presence of spermatozoa. A DNA extraction from that same area yielded a DNA mixture of two persons, at least one of whom was male. The defendant's DNA profile was included within the male DNA profile of the extracted DNA mixture. A forensic examiner concluded from the DNA analysis, after assuming that the victim was the other contributor, that the DNA mixture was one hundred billion times more likely to occur if it came from the defendant and the victim, rather than from the victim and another unknown individual in the general population.

The defendant was subsequently arrested and charged in a long form information with sexual assault in the fourth degree in violation of § 53a-73a (a) (1) (A) and risk of injury to a child in violation of § 53-21 (a) (2). A trial followed, at which the state presented testimony from the victim; J; the victim's brother; the victim's mother; Jason Paul Prevelige, the physician's assistant at Saint Mary's Hospital who examined the victim; Danielle Williams, an expert on child forensic interviews; Koval; Christine Roy, the state forensic examiner who tested the clothing; and Jian Tao, the state forensic analyst who conducted the DNA analysis. The defense presented testimony from the defendant's mother and Nancy Eiswirth, an expert on investigation protocols used in sexual assault cases involving child victims. At the conclusion of trial, the jury found the defendant guilty of both charges. On August 26, 2022, the court, *Pelosi, J.*, sentenced the defendant to a total effective sentence of twenty years of incarceration, execution suspended after nine years, five of which were a statutory mandatory minimum, and fifteen years of probation. It also ordered the defendant to register as a sexual

offender for a period of ten years. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant claims that the court violated his right to due process under article first, § 8, of the Connecticut constitution,[5] when it denied his pretrial motion to dismiss the charges against him or, in the alternative, to suppress evidence, in which he alleged that the police improperly failed to preserve and to collect certain evidence relating to the leggings and underwear recovered from the hamper in the victim's bedroom. He asserts that an order of remand for dismissal or a new trial is warranted. We disagree.

The following additional facts and procedural history are relevant to our resolution of this claim. When Koval went to the victim's home to locate the leggings and underwear that she was wearing during the sexual assault, the victim's brother directed him to the victim's bedroom. On entering the victim's bedroom, Koval located the hamper and took a photograph of "the hamper itself." After taking that photograph, Koval put gloves on and moved other clothes in the hamper to the side to search for the leggings and underwear. Koval testified that, while he was searching through the hamper, he saw "typical girl's laundry, underwear, socks, shirts" but that he was not really paying attention to the other clothes inside of it, nor did he collect anything else as evidence from the hamper or the rest of the home. He did not take a photograph of any of the other items in the hamper. After finding the leggings and underwear in the hamper,[6] he collected them and

___

[5] Article first, § 8, of the Connecticut constitution provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

[6] Koval described the state of the leggings and underwear in the hamper as being "together, the underwear [was] inside of the pants."

brought them to the police station for processing, where he took a photograph of the leggings. He then separated the leggings and the underwear and placed each item into its own evidence bag. Thereafter, the clothing was brought to the state laboratory for testing. Subsequently, both of the photographs taken by Koval—one of the hamper taken in the victim's room and one of the leggings taken at the police station—were lost when he attempted to transfer them from his camera to a computer at the police department.[7]

Prior to trial, on May 2, 2022, the defendant filed a motion to dismiss the charges against him, or alternatively, to suppress the evidence from the hamper "and the 'poison fruit' results of any forensic testing performed upon the seized clothing," pursuant to *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995), based on the failure of law enforcement to collect and preserve evidence. Specifically, in his motion to dismiss the defendant argued that Koval's failure to "preserve the hamper and its contents" was a violation of his right to due process under the state constitution. The defendant further argued that the evidence in question was exculpatory given the defense's theory of DNA transfer— that the other contents of the hamper, if preserved, could have exonerated the defendant because, if any of the uncollected clothes in the hamper belonged to the defendant, that could have provided an explanation for how his DNA transferred onto the victim's clothing.

On May 20, 2022, the court held an evidentiary hearing and heard oral argument on the defendant's motion.

---

[7] When asked during cross-examination by defense counsel to explain the process of how the photographs were lost, Koval testified: "The SD card was taken from the camera, put into a card reader, which was attached to the computer. . . . And when the [police] sergeant went to transfer them, there must have been a faulty SD card or SD reader." Koval also stated that he did not report the loss of the photographs or make any efforts to recover them.

The defendant called Koval as a witness and argued that the failure to collect and preserve the contents of the hamper and the loss of the two photographs taken by Koval deprived him of material evidence and the opportunity to fully present his DNA transfer defense because (1) other items in the hamper could not be tested for the defendant's DNA and (2) neither the jury nor the defense would be able to see the state of the hamper's contents from Koval's position at the time he seized evidence from it. In response, the state argued that *Morales* and its progeny pertain to claims regarding the preservation of evidence that is lost or destroyed, not claims that law enforcement failed to preserve evidence that it never collected. The state also argued that the other contents of the hamper could not be considered material evidence because whether such evidence would have benefitted the defendant was speculative and that any failure to preserve evidence by Koval was not done in bad faith.

The court orally denied the defendant's motion on the first day of trial, May 24, 2022, and subsequently issued a memorandum of decision dated June 29, 2022.[8] The court applied the four factor balancing test set forth in *State* v. *Asherman*, 193 Conn. 695, 724, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), to determine whether Koval's failure to preserve the contents of the hamper, the photograph of the hamper and the photograph of the leggings, violated the defendant's state constitutional right to due process. Specifically, the court considered "[1] the materiality of [the] missing evidence, [2] the likelihood of mistaken interpretation of the missing . . . evidence by witnesses or the jury, [3] the reason for [the] nonavailability [of the evidence], [and] [4]

---

[8] The court incorporated the findings of its oral decision into its memorandum of decision.

the prejudice to the defendant caused by the unavailability of the evidence." The court applied each factor to the defendant's claims regarding the contents of the hamper and the lost photographs.

As to the contents of the hamper, the court determined that, (1) "even assuming that the defendant's DNA was transferred to the [victim's] underwear through commingling in the hamper, this is not [material because it is not] dispositive of the charges the defendant faces [and] [i]ndeed, the [victim] has stated to a number of people, including medical personnel, police officers, and constancy witnesses that she was assaulted by the defendant"; (2) "there is little likelihood of mistaken interpretation, as the defendant will have the opportunity to cross-examine [Koval] concerning the collection of the DNA evidence . . . and the decision to not test the other contents in the hamper"; (3) "there was no improper motive or bad faith on the part of . . . Koval . . . [and] at the time the evidence was seized, it was unclear if it would yield any useful information [and] [f]urther, it was outside of the state's purview that failing to test and photograph all of the items in the hamper may yield some injustice to the defendant"; and (4) "[t]he defendant . . . will not suffer substantial prejudice by way of the missing evidence. The court can address any potential prejudice that this evidence will have on the defendant by allowing the defendant to cross-examine the state's witnesses and by allowing the defendant to focus on the state's failure to preserve the other contents of the hamper in his closing argument. Additionally, the court could provide the jury with a limiting instruction or an instruction concerning the weight they are permitted to give to certain evidence."

Regarding the lost photographs, the court held that (1) "the defendant is unable to show that there is a reasonable probability that, had the photo[graph] taken

by . . . Koval of the [victim's] hamper been preserved, the result of the present proceeding would be different [and] [i]t is speculative that the photograph taken by . . . Koval, alone, would be exculpatory"; (2) "there is little likelihood of mistaken interpretation, as the defendant will have the opportunity to cross-examine the state's witnesses concerning . . . the missing photograph"; and (3) "the loss of the photograph was unintentional and was not done in bad faith or with malice."

At trial, the defendant's theory of the case was that there were communal hampers in the victim's home and, therefore, his DNA could have become commingled with the victim's DNA. The defense attempted to advance his theory by cross-examining the victim's brother and her mother about how laundry was typically done in the home.[9] Defense counsel also extensively cross-examined Koval about his investigation of the home—including whether he was concerned about the possibility of DNA transfer—and about the loss of the photographs. In addition, the defense called the defendant's mother as a witness and elicited testimony concerning her knowledge of the location and use of hampers in the victim's home.[10] Defense counsel continued

---

[9] The victim's brother and her mother both testified, however, that the hampers in the home were not communal. The victim's mother testified that "we each have our own [hampers] in our bedrooms." Likewise, the victim testified that each member of her family had a hamper that was a different color and that "everyone's clothes were kept separate." She described her hamper as being white, tall and circular and further testified that it was for her room only.

[10] The defendant's mother testified that she "frequently" visited the victim's home and would assist with household chores, including laundry, due to the close relationship between her and the victim's mother, that she never observed any effort in the victim's home to keep the laundry for each resident of the home separate, and that the hampers were not exclusive to any particular room in the home. She also testified, however, that from the date of the sexual assault to the date it was first reported, she did not assist with laundry in the victim's home and that she had stated she would stand by her son the morning after learning about the assault.

reinforcing the theory of commingling and DNA transfer during closing argument by arguing that the victim's account that she did not feel anything wet on her buttocks was inconsistent with the presence of the defendant's bodily fluids on her underwear. Defense counsel also asked the jury if it was reasonable to believe that the evidence remained in the hamper for eight days without contamination and stated that the DNA analysis cannot explain how, when or in what order the defendant's genetic materials ended up in the hamper.

Defense counsel also challenged the adequacy of the police investigation through his cross-examination of Koval and in his closing argument. As a result, the court gave an instruction on the adequacy of the police investigation to the jury, which included an instruction regarding the failure of the police to adequately preserve and document evidence relating to the contents of the hamper and their failure to preserve the two photographs.[11]

We next set forth the relevant standard of review and principles of law that govern this claim. "[O]ur Supreme

---

[11] The court's jury instruction stated in relevant part: "You have heard some testimony of witnesses and arguments by counsel that the state did not adequately preserve and document evidence relative to lost photographs and the documentation of the hamper and its contents. This is a factor that you may consider in deciding whether the state has met its burden of proof in this case, because the defendant may rely on relevant deficiencies or lapses in the police investigation to raise reasonable doubt. Specifically, you may consider whether a failure to adequately preserve and document this evidence would normally be  .  .  .  taken under the circumstances. Whether if these actions were taken, they could reasonably have been expected to lead to significant evidence of the defendant's guilt or evidence creating a reasonable doubt of his guilt and whether there are reasonable explanations for the admission of those actions. If you find that any omission[s] in the investigation were significant and not reasonably explained, you may consider whether the omissions tend to affect the quality, reliability or credibility of the evidence presented by the state to prove beyond a reasonable doubt that the defendant is guilty of the counts with which he is charged in the information. The ultimate issue for you to decide, however, is whether the state, in light of all the evidence before you, has proved beyond a reasonable doubt that the defendant is guilty of the counts for which he is charged."

Court has set forth the analytical path for determining whether the failure of the police to preserve evidence constitutes a due process violation under our state constitution. In [*Morales*], the court expressly rejected the federal standard of *Arizona* v. *Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).[12] The court in *Morales* held that 'the good or bad faith of the police in failing to preserve potentially useful evidence cannot be dispositive of whether a criminal defendant has been deprived of due process of law. . . . Rather, in determining whether a defendant has been afforded due process of law under the state constitution, the trial court must employ the [*Asherman*] balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: [(1) the materiality of the missing evidence, (2) the likelihood of mistaken interpretation of it by witnesses or the jury, (3) the reason for its nonavailability to the defense, and (4) the prejudice to the defendant caused by the unavailability of the evidence.]' . . . '[P]olice [are not required] to preserve every shred of physical evidence, every object . . . [seized] from a crime scene, no matter how remote or tangential to the case the item seems to be. The . . . court should . . . [consider] the reason for the unavailability of an item of evidence, as well as the motivation and good or bad faith of the police in failing to preserve that evidence.' " (Citations omitted; footnote in original.) *State* v. *Thompson*, 128 Conn. App. 296, 301–303, 17 A.3d 488 (2011), cert. denied, 303 Conn. 928, 36 A.3d 241 (2012).

---

[12] "In *Arizona* v. *Youngblood*, supra, 488 U.S. 58, the United States Supreme Court stated: 'We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.' " *State* v. *Thompson*, 128 Conn. App. 296, 302 n.1, 17 A.3d 488 (2011), cert. denied, 303 Conn. 928, 36 A.3d 241 (2012).

"[W]hether [the circumstances] constituted a violation of the [defendant's right to due process] is a mixed determination of law and fact that requires the application of legal principles to the historical facts of the case. . . . Whether the historical facts as found by the [trial] court constituted a violation of the [defendant's right to due process] is subject to plenary review by this court, unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *State* v. *Gray*, 212 Conn. App. 193, 206–207, 274 A.3d 870, cert. denied, 343 Conn. 929, 281 A.3d 1188 (2022).

A

We first address the defendant's claim as it pertains to the failure of law enforcement to preserve the contents of the hamper. Particularly, the defendant claims that Koval's failure to preserve "uncollected evidence"—the contents of the hamper at the time he searched it—violated the defendant's right to due process. We disagree.

Both the state and the defendant analyzed this issue in their appellate briefs pursuant to *Morales* and by applying the *Asherman* balancing test. The state, however, also advanced the argument that "Koval's alleged failure . . . did not implicate the defendant's due process right under *Morales* because it relates to the creation, not preservation, of evidence." The defendant claims that this argument constitutes an improper alternative ground for affirmance, which is not supported by the record, and that Koval "had an obligation to preserve the evidence inside the hamper, which was under his possession and control at the time that he seized the [victim's] clothing." After considering the arguments of the state and the defendant on this issue, we agree with the state that any failure by law enforcement in this case to collect and preserve the contents

of the hamper does not implicate the defendant's right to due process.

The defendant argues that we are barred from affirming the court's decision on this ground because nothing in the record establishes that such reasoning was an alternative ground for the court's denial of the defendant's due process claim. This assertion, however, ignores the fact that our review of the court's conclusions regarding "[w]hether the historical facts . . . constituted a violation of the [defendant's right to due process]" is plenary. (Internal quotation marks omitted.) *State* v. *Gray*, supra, 212 Conn. App. 206–207; see also *Council* v. *Commissioner of Correction*, 114 Conn. App. 99, 103 n.1, 968 A.2d 483 ("[a]n allegation of a violation of due process . . . is a question of law"), cert. denied, 292 Conn. 918, 973 A.2d 1275 (2009). It follows that the same standard of review applies when determining whether the historical facts of a case *implicate* a defendant's right to due process because for conduct to constitute a violation of an individual's due process rights, it must implicate those rights in some tangible way. See *State* v. *Collymore*, 334 Conn. 431, 477, 485, 223 A.3d 1 (applying plenary review to defendant's due process claim based on admission of identification testimony and rejecting claim because testimony "*did not implicate* the defendant's due process rights" (emphasis added)), cert. denied, U.S. , 141 S. Ct. 433, 208 L. Ed. 2d 129 (2020). Therefore, we reject the defendant's contention that we cannot affirm the judgment of conviction on this basis because, regardless of whether the trial court relied on it as an alternative ground for its decision, our plenary standard of review over this issue entitles us to determine, as a matter of law, whether the conduct at issue implicated the defendant's right to due process under *Morales*. If it did, application of the *Asherman* balancing test is

appropriate, but if it did not, the defendant's due process claim regarding the contents of the hamper must fail outright. See *State* v. *Johnson*, 288 Conn. 236, 281, 951 A.2d 1257 (2008) (rejecting defendant's due process claim brought pursuant to *Morales* without applying *Asherman* test because defendant did "not adequately [allege] a failure to preserve . . . thus, *Youngblood* and *Morales* [were] not applicable" and "no need for the *Morales* remedies ever arose").

To resolve this claim, we therefore first must determine whether the claim that Koval failed to collect and preserve the entire contents of the hamper as evidence is an allegation that sufficiently implicates the defendant's due process rights under *Morales*. "[I]t is well established that there are two areas of constitutionally guaranteed access to evidence such that denying or foreclosing the defendant's access to that evidence may constitute a due process violation. . . . The first situation concerns the withholding of exculpatory evidence by the police from the accused. . . . The second situation . . . concerns the failure of the police to preserve evidence that might be useful to the accused." (Citations omitted; emphasis omitted; internal quotation marks omitted.) Id., 275–76. The defendant claims that Koval's failure to collect and preserve the entire contents of the hamper as evidence is encompassed by the second situation.

Significantly, *Johnson* involved a similar claim, namely, that law enforcement's failure to record the entirety of an interview with a state's witness violated the defendant's right to due process. Id., 270. In that case, our Supreme Court clarified that "*Morales* and *Youngblood* address the 'preservation' of evidence, *not the collection and creation of evidence*" and "conclude[d] that the duty to preserve with which *Morales* and *Youngblood* are concerned *depends on the* [*state's*] *possession of evidence* capable of being preserved."

(Emphasis added.) Id., 279. The court further noted that "a review of our case law generally reveals nothing . . . that would *support the existence of an affirmative duty to create evidence* . . . ." (Emphasis added.) Id. Our Supreme Court, therefore, rejected the defendant's claim that "police officers ha[ve] a duty to record the entirety of their interviews with [state's witnesses] and that [the] failure to do so constitute[s] a failure to preserve evidence within the meaning of *Morales* and *Youngblood.*" Id., 278. As a result, the court concluded that "the state did not violate the defendant's due process rights, as a matter of law," and, in doing so, it denied the due process claim without any application of the *Asherman* balancing test. Id., 281.

More recently, this court relied on *Johnson* in rejecting "an analogous claim" that "[a law enforcement officer's] decision to turn off his body microphone so that his conversation with [another law enforcement officer] was never recorded is, in essence, the legal equivalent of the state failing to preserve or destroying evidence" within the meaning of *Morales* and *Youngblood. State* v. *Bouvier*, 209 Conn. App. 9, 35, 267 A.3d 211 (2021), cert. denied, 341 Conn. 903, 269 A.3d 789 (2022). In *Bouvier*, we determined that "[a] trooper's choice not to record audio of a consultation between himself and another law enforcement officer did not result in the creation of evidence that was capable of either preservation or destruction" and, thus, the "basic factual predicate underlying the alleged due process violation [was] missing . . . ." Id., 39. Accordingly, we rejected the defendant's due process claim in *Bouvier* without applying the *Asherman* balancing test.

Importantly, our holding in *Bouvier* recognized that, generally, procedures amounting to "administrative directives or best practices" do not "[create] any cognizable due process interest in the defendant as might be the case with a duly enacted statute or properly

promulgated regulation"; id., 38; and that, as "the [Supreme] [C]ourt in *Johnson* made clear, *the due process clause is not implicated by a claim that*, in the absence of an express legal duty to do so, *the state failed to collect or create certain evidence.*" (Emphasis added.) Id., 37–38.[13]

In the present case, the evidence in the record persuades us that Koval's failure to collect and preserve the contents of the hamper as evidence did not implicate the defendant's right to due process under *Morales*. We also conclude that we need not apply the *Asherman* balancing test in such circumstances, as the alleged failure to preserve, which was predicated on a failure to collect or to create evidence, did not implicate the defendant's right to due process.[14] The record in this case shows that Koval never seized the contents of the hamper, meaning those contents were never in his possession, and the defendant acknowledges as much in his appellate brief on the issue when he refers to the contents of the hamper as "*uncollected evidence.*" (Emphasis added.) Therefore, the defendant cannot demonstrate that the state was in possession of the contents of the hamper but failed to preserve them, which is required to show a due process violation under

---

[13] See also *State* v. *Beckerman*, 145 Conn. App. 767, 85 A.3d 655 (2013), cert. denied, 311 Conn. 938, 89 A.3d 349 (2014). In *Beckerman*, we noted in dicta that the defendant's due process claim in an arson prosecution, namely, that "the state had a duty to preserve for testing a sample of the area around the furnace [in the home that caught fire] where [the canine belonging to the fire marshal detective investigating the scene] alerted to the presence of accelerants"; id., 774; rested "on the premise that the state has a duty to *collect* evidence, rather than simply to preserve evidence that has been collected in the course of an investigation"; (emphasis in original) id., 777 n.6; and we rejected the claim because it did not challenge the trial court's finding that there was no bad faith. Id., 777.

[14] Additionally, the defendant's reference in his appellate brief to "best practices" in evidence gathering is immaterial because the defendant has failed to demonstrate that any of these "best practices" created a "cognizable due process interest" in him. *State* v. *Bouvier*, supra, 209 Conn. App. 38.

*Morales.*[15] See *State* v. *Johnson*, supra, 288 Conn. 279. As we have stated, this court and our Supreme Court have recognized that *Morales* does not apply to "the collection . . . of evidence"; id.; and the defendant has provided no support for his claim that law enforcement officers possess an affirmative constitutional duty to collect evidence. Thus, we conclude that the conduct at issue in the present case does not implicate the defendant's right to due process under *Morales.*[16] The defendant's due process claim, therefore, fails as a matter of law.

[15] We find the defendant's argument that the state was obligated to preserve the entire contents of the hamper because they were in Koval's possession and under his control at the time of his search to be without merit for a number of reasons. First, the defendant did not provide any authority to support his proposition that the state is considered to be in possession of containers that law enforcement officers search but do not seize. Second, applying the defendant's proposed logic to commonplace scenarios involving law enforcement would defy practicality. See *State* v. *Johnson*, supra, 288 Conn. 279–80 (declining to adopt rule proposed by defendant because "[t]here is a need by law enforcement personnel for considerable flexibility in how they go about their investigations, and courts should not intrude into this area," and "the adoption of such a rule would place a substantial burden on the administration of law enforcement and would amount to an unwarranted intrusion by the courts into the professional practices chosen by our trained law enforcement personnel" (internal quotation marks omitted)). For instance, under the defendant's logic, law enforcement officers who exercise control over a home while executing a search warrant would be in possession of the home, which would then entail an obligation to preserve the entire contents of the home as evidence. Such a result would clearly be impractical and more importantly, would also be contrary to our Supreme Court's recognition in *Morales* that "the *Asherman* test does not require the police to preserve every shred of physical evidence, every object it seizes from a crime scene, no matter how remote or tangential to the case the item seems to be." *State* v. *Morales*, supra, 232 Conn. 723.

[16] We note that a majority of the states that have reached this issue have likewise determined that constitutional due process requirements do not impose on law enforcement officers a duty to collect evidence. See, e.g., *People* v. *Fultz*, 69 Cal. App. 5th 395, 425, 284 Cal. Rptr. 3d 515 (2021) ("[D]ue process does not require the police to collect particular items of evidence. . . . The police cannot be expected to gather up everything which might eventually prove useful to the defense." (Internal quotation marks omitted.)); *State* v. *Stepter*, 794 S.W.2d 649, 655 (Mo. 1990) ("[t]he state is not bound to gather and present all physical evidence conceivably germane to its [case-

## B

We next address the defendant's claim as it pertains to the failure of police to preserve the two photographs

in-chief]" nor "is [it] required to account for its failure to gather or present such evidence" (internal quotation marks omitted)); *Taylor* v. *State*, 375 Mont. 234, 238, 335 P.3d 1218 (2014) ("[p]olice officers have no duty to take initiative or even assist in procuring evidence on behalf of a defendant"); *Belcher* v. *State*, 136 Nev. 261, 272, 464 P.3d 1013 (2020) ("[p]olice officers generally have no duty to collect all potential evidence from a crime scene" (internal quotation marks omitted)); *State* v. *Ware*, 118 N.M. 319, 323, 881 P.2d 679 (1994) ("the failure to gather evidence is not the same as the failure to preserve evidence, and . . . the [s]tate generally has no duty to collect particular evidence at the crime scene"); *State* v. *Steffes*, 500 N.W.2d 608, 612 (N.D. 1993) ("[p]olice generally have no duty to collect evidence for the defense"); *State* v. *Young*, 176 N.E.3d 1074, 1106 (Ohio App. 2021) ("the state has no duty to gather exculpatory evidence"), review denied, 165 Ohio St. 3d 1505, 179 N.E.3d 122 (2022); *State* v. *Pemental*, 434 A.2d 932, 936 (R.I. 1981) (no due process violation in sexual assault case where defendant claimed law enforcement "fail[ed] to seize the bed linen of the victim and to have the linen scientifically analyzed"). Although a few states have indicated that this rule is not absolute; see, e.g., *People ex rel. Gallagher* v. *District Court*, 656 P.2d 1287, 1291 (Colo. 1983) ("police investigators have no general duty to search out possible exculpatory evidence or to perform tests . . . however . . . when evidence can be collected and preserved in the performance of routine procedures by state agents . . . the state must employ regular procedures to preserve evidence which a state agent, in the regular performance of his duties, could reasonably foresee might be favorable to the accused" (citations omitted)); *State* v. *Hayes*, 203 Vt. 153, 160, 154 A.3d 964 (2016) ("even though police do not have a duty to collect *all* potentially exculpatory evidence, [a state law remedy may] apply in situations where the [s]tate's failure to procure potentially exculpatory evidence results in prejudice—for example, failing to procure a bloody knife lying next to a body in a murder case" (emphasis in original)); only a minority of states, Alaska and Kentucky among them, have adopted a contrary rule. See *Snyder* v. *State*, 930 P.2d 1274, 1277 (Alaska 1996) (state rules of criminal procedure impose affirmative duty on state to collect "*material*" evidence (emphasis in original; internal quotation marks omitted)); *Collins* v. *Commonwealth*, 951 S.W.2d 569, 572 (Ky. 1997) (applying *Youngblood* to due process claim that state failed to collect evidence).

Federal courts, however, have reached differing conclusions on the issue. Compare *Miller* v. *Vasquez*, 868 F.2d 1116, 1119–20 (9th Cir. 1989) (noting that government's duty to preserve evidence does not impose duty to obtain evidence but nonetheless "hold[ing] that a bad faith failure to collect potentially exculpatory evidence would violate the due process clause"), with *United States* v. *Roper*, Docket No. 1:23-cr-1617 (WJ), 2024 WL 3688266, *2

that Koval took of the hamper and the leggings, to which the *Asherman* balancing test applies.

The first *Asherman* factor involves the materiality of the missing evidence. "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed [or available] to the defense, the result of the proceeding would have been different. . . . On the other hand, [t]he defendant's mere speculation that the [lost evidence] could have been beneficial or not does not meet the standard necessary to prove materiality." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Fox*, 192 Conn. App. 221, 237–38, 217 A.3d 41, cert. denied, 333 Conn. 946, 219 A.3d 375 (2019). The defendant argues that the lost photographs were material based on his theory of the case because "the lack of photographic documentation undermined any ability to observe the hamper, its condition and contents or any other missed details," and the "[m]ovement of the [victim's] clothing during Koval's seizure *could have* been a source of [DNA] transfer." (Emphasis added.) Therefore, he argues, the "court . . . had insufficient information . . . without photographs" to reach conclusions regarding the location of the leggings and underwear when Koval found them.

We are not persuaded that there is a reasonable probability that, had the photograph of the hamper located in the victim's room and the photograph of the leggings taken at the police station been available to the defendant, the result of the proceeding would have been

(D.N.M. August 7, 2024) ("the [d]ue [p]rocess [c]lause is not violated if law enforcement simply fails to collect evidence"); *White* v. *Tamlyn*, 961 F. Supp. 1047, 1062 n.12 (E.D. Mich. 1997) (characterizing *Miller* as "an aberration and the law only in the Ninth Circuit"); *Colon* v. *Kuhlmann*, Docket No. 87-CIV. 2980 (MGC), 1988 WL 61822, *5 (S.D.N.Y. June 3, 1988) (failure to collect rape victim's underwear did not violate due process because "due process clause . . . does not require that particular evidence be gathered"), aff'd, 865 F.2d 29 (2d Cir. 1988).

different. The lost photographs, as described in the record, would have shown nothing more than "the hamper itself" before Koval searched it and the state of the victim's leggings and underwear before they were separated, placed into evidence bags and sent to the state laboratory. Thus, we conclude that the defendant cannot establish the materiality of the two lost photographs, and, therefore, the first *Asherman* factor weighs in favor of the state.[17]

The second *Asherman* factor requires us to consider the likelihood of mistaken interpretation of the missing evidence by witnesses or the jury. "This court . . . has held that [m]istaken interpretation can be minimized at the trial by permitting testimony on the issue"; (internal quotation marks omitted) *State* v. *Gray*, supra, 212 Conn. App. 211; or "by an appropriate instruction from the court permitting the jury to draw an adverse inference against the state." (Internal quotation marks omitted.) *State* v. *Jones*, 50 Conn. App. 338, 357–58, 718 A.2d 470 (1998), cert. denied, 248 Conn. 915, 734 A.2d 568 (1999). The defendant argues that, "[a]lthough [he] was able to cross-examine the state's witnesses [about the lost photographs], that testimony did not minimize the significance of the missing evidence or the risk of mistaken interpretation" because "[t]he jury also heard conflicting and vague testimony from Koval about the contents of the hamper."

---

[17] The defendant's argument that the lost photographs of either the hamper or the leggings *could* have supported a theory of DNA transfer is misplaced because photographs of the "hamper itself" and the leggings do not do anything to further that theory. Indeed, such a purely speculative argument is not sufficient to show a reasonable probability that the result of the proceeding would have been different if the photographs were available. See *State* v. *Barnes*, 127 Conn. App. 24, 33, 15 A.3d 170 (2011) (first *Asherman* factor weighed against defendant who argued that lost audio recordings "were the only piece of evidence that 'could have' proven [his] guilt or innocence" because "mere speculation that the tapes could have been beneficial *or not* simply does not meet the standard necessary to prove materiality" (emphasis in original)), aff'd, 308 Conn. 38, 60 A.3d 256 (2013).

Here, the court permitted defense counsel to engage in extensive cross-examination of Koval regarding the lost photographs,[18] which elicited a description of how they were lost, and he also referenced Koval's inadequate and incomplete investigation and the lost photographs several times during closing argument, claiming that Koval tainted the investigation in an attempt to raise reasonable doubt in the minds of the jurors. Finally, the court gave the jury a detailed instruction[19] addressing the lost photographs that included the following language: "If you find that any omission[s] in the investigation were significant and not reasonably explained, you may consider whether the omissions tend to affect the quality, reliability or credibility of the evidence presented by the state to prove beyond a

---

[18] For example, during defense counsel's cross-examination of Koval, the following exchange occurred:

"[Defense Counsel]: Okay. So, what did you do [after learning that the photographs were lost]?

"[Koval]: I didn't do anything at that point.

"[Defense Counsel]: Okay. You didn't complete a supplemental report documenting the fact that this evidence had been lost?

"[Koval]: Not at that point, no.

"[Defense Counsel]: Okay. At any point in time did you author a police report documenting the loss of those photographs?

"[Koval]: No.

"[Defense Counsel]: Did you take that SD card or that camera and send it up to the state lab in an effort to recover these photos?

"[Koval]: No.

"[Defense Counsel]: So, the only documentation of that hamper—did you do anything else to document that hamper in the position it was in?

"[Koval]: No.

"[Defense Counsel]: So, the only documentation of that—of that hamper, in that position where it was, has been lost?

"[Koval]: Correct.

"[Defense Counsel]: And no effort was made to try and recover those photos, correct?

"[Koval]: Not at that time, no.

"[Defense Counsel]: And no documentation was made regarding that loss of evidence?

"[Koval]: Correct."

[19] See footnote 11 of this opinion.

reasonable doubt that the defendant is guilty of the counts with which he is charged in the information." On the basis of the record in this case, including the testimony that described the content of the photographs and how they were lost, it is not likely that the jury was misled by the missing photographs, as it was presented with ample testimony and an instruction concerning the missing photographs. See *State* v. *Fox*, supra, 192 Conn. App. 240 (second *Asherman* factor weighed in favor of state "[g]iven the ample testimony regarding the missing photographs"); *State* v. *Barnes*, 127 Conn. App. 24, 33–34, 15 A.3d 170 (2011) (same where defendant was "provided wide leeway" in cross-examination about missing evidence and "used the missing [evidence] as a means of attempting to raise reasonable doubt in the mind of the jury during closing argument"), aff'd, 308 Conn. 38, 60 A.3d 256 (2013). We therefore conclude that the likelihood of mistaken interpretation of the missing evidence at trial was minimal and that this factor weighs in the state's favor.

The third *Asherman* factor concerns the reason for the nonavailability of the evidence. "In weighing the third *Asherman* factor . . . our cases have focused on the motives behind the destruction of the evidence. . . . In examining the motives . . . our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights." (Internal quotation marks omitted.) *State* v. *Gray*, supra, 212 Conn. App. 212.

The defendant concedes that there is no evidence of bad faith by law enforcement here but, nonetheless, argues that this factor weighs in his favor because "Koval's gross indifference in the . . . preservation of

the evidence . . . result[ed] in a fundamentally unfair trial." Given the defendant's concession that there was no evidence that Koval acted with bad faith in his handling of the lost photographs, we conclude that this factor weighs in favor of the state.[20] See *State* v. *Fox*, supra, 192 Conn. App. 241 (third *Asherman* factor weighed in favor of state because defendant was "unable to establish" that missing evidence was due to "improper motive or animus"); *State* v. *Barnes*, supra, 127 Conn. App. 34 (same where defendant conceded lack of evidence of bad faith).

The final *Asherman* factor requires consideration of the prejudice caused to the defendant due to the

---

[20] Despite acknowledging the lack of evidence of bad faith here, the defendant attempts to support his claim on appeal by arguing that Koval acted with "gross indifference" with respect to the preservation of evidence at the crime scene. Unlike a reference to bad faith, malice, or even gross negligence, the defendant's reference to "gross indifference" does not invoke a legal term of art commonly used by Connecticut courts in any context. Nevertheless, based on the arguments made by the defendant, we do not view the claimed "gross indifference" as rising to the same level of severity as conduct undertaken maliciously, or with bad faith or reckless indifference, of which the *Asherman* test requires consideration. Rather, we view the defendant's claim of "gross indifference" as invoking conduct more akin to ordinary, or gross, negligence. See *Rubel* v. *Wainwright*, 86 Conn. App. 728, 741, 862 A.2d 863 ("[r]ecklessness . . . is more than negligence and also is more than gross negligence"), cert. denied, 273 Conn. 919, 871 A.2d 1028 (2005); see also *State* v. *Gray*, supra, 212 Conn. App. 214–15 (finding third *Asherman* factor weighed against state even though record did not reflect animus or improper motive, because police department's policy violating state law "constituted a reckless disregard of the defendant's rights").

Even if we assume that Koval was grossly negligent in his handling of the lost photographs, that fact would not impact our *Asherman* analysis. See *State* v. *Gray*, supra, 212 Conn. App. 212 ("[i]n examining the motives [behind the destruction of evidence] . . . our courts have considered such factors as whether the destruction was deliberate and intentional *rather than* negligent" (emphasis added; internal quotation marks omitted)); see also *State* v. *Morales*, 39 Conn. App. 617, 627, 667 A.2d 68 ("while the police department may have been negligent in returning the jacket to the victim," because there was "no evidence of bad faith or an intention to harm," it was not improper for the court to find "that the reason for the unavailability of the jacket did not significantly tip the *Asherman* scale in favor of the defendant"), cert. denied, 235 Conn. 938, 668 A.2d 376 (1995).

unavailability of the evidence. "In measuring the degree of prejudice to an accused caused by the unavailability of the evidence, a proper consideration is the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case. . . . [T]his court repeatedly has held that a trial court may ameliorate any prejudice resulting from unavailable evidence by providing the defendant with unfettered cross-examination and by allowing the defendant to focus on the state's failure to produce such evidence during closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Gray*, supra, 212 Conn. App. 215–16. "In analyzing this prong, our courts have evaluated the strength of the state's case by reviewing the 'testimony and exhibits [introduced at trial], *aside from*' the missing evidence." (Emphasis in original.) Id., 236 (*Prescott, J.*, concurring), quoting *State* v. *Morales*, 90 Conn. App. 82, 92, 876 A.2d 561, cert. denied, 275 Conn. 924, 883 A.2d 1250 (2005). The defendant argues that "Koval's failure to properly document or observe the crime scene made the loss of the only photograph taken there critical" and that "the missing photographs . . . undermined the defendant's ability to present a defense and hobbled his [DNA] transfer theory."

Our review of the record leads us to conclude that the direct and circumstantial evidence presented by the state provided strong evidence of the defendant's guilt. At trial, the victim testified about the details of the sexual assault and identified the defendant as the perpetrator, and three constancy of accusation[21] witnesses—

---

[21] "[T]he constancy of accusation doctrine . . . permits the victim in a sexual assault case . . . to testify on direct examination regarding the facts of the sexual assault and the identity of the person or persons to whom the incident was reported. . . . Thereafter, if defense counsel challenges the victim's credibility by inquiring, for example, on cross-examination as to any out-of-court complaints or delayed reporting, the state will be permitted to call constancy of accusation witnesses subject to [certain] limitations . . . . If defense counsel does not challenge the victim's credibility in any

the victim's mother and brother, and J—testified that the victim told them that the defendant had sexually assaulted her.[22] Moreover, the underwear itself, along with the leggings worn by the victim during the assault, were both entered into evidence as physical exhibits for the jury to inspect. The state also offered as evidence the results of a DNA analysis linking the defendant to a semen stain found on the victim's underwear and testimony from the state laboratory employees who analyzed the evidence. Furthermore, the prosecutor elicited testimony from Williams, an expert witness on

---

fashion on these points, the trial court shall not permit the state to introduce constancy testimony but, rather, shall instruct the jury that there are many reasons why sexual assault victims may delay in officially reporting the offense, and, to the extent the victim delayed in reporting the offense, the delay should not be considered by the jury in evaluating the victim's credibility. . . . A constancy of accusation witness is limited to testifying only with respect to the fact and timing of the victim's complaint; any testimony by the witness regarding the details surrounding the assault must be strictly limited to those necessary to associate the victim's complaint with the pending charge, including, for example, the time and place of the attack or the identity of the alleged perpetrator." (Citation omitted; internal quotation marks omitted.) *State* v. *Dionne*, 207 Conn. App. 106, 112–13, 262 A.3d 961, cert. denied, 340 Conn. 910, 264 A.3d 577 (2021).

[22] Given this testimony, the court gave the jury a constancy of accusation limiting instruction, stating, in part: "In this case you heard testimony that, sometime after the alleged sexual offense, [the victim] made out-of-court statements to other persons, [her brother], [J] and [her mother], about what had taken place. More particularly, there was testimony about the time, place, identity and general nature of the defendant's alleged sexual assault of [the victim]. The law recognizes that people might assume that anyone subjected to a sexual offense would complain within a reasonable time to someone to whom she ordinarily would turn for sympathy, protection or advice. If there was no evidence that a complainant made such a complaint, some might conclude that no sexual offense occurred. As a result, in cases involving an allegation . . . of a sexual offense, the state is permitted in certain circumstances to introduce out-of-court statements to other persons about what occurred. The only reason that the evidence is permitted, is to negate the inference that the complainant failed to confide in anyone about the sexual offense. In other words, the narrow purpose of the constancy evidence is to negate any inference that [the victim] failed to tell anyone about the sexual offense and therefore that [her] later assertion cannot be believed."

child forensic interviews, explaining how perceived inconsistencies in the account of a child who has been sexually assaulted can arise and be cleared up during the forensic interview process.[23]

By contrast, the defendant presented a DNA transfer theory, which, aside from the testimony of his mother that she had assisted with laundry at the victim's home, although not during the time period after the sexual assault, amounted to unsubstantiated speculation based on what the photograph and contents of the hamper *could have* shown if available. Indeed, the theory and testimony offered by the defendant was contradicted by the testimony of the victim, her brother, and her mother, as well as the lack of *any* evidence in the record that the defendant had masturbated in the victim's home, which was the factual predicate underlying his theory of DNA transfer. Likewise, the record was devoid of any evidence that, in the eight days that elapsed between the sexual assault and the victim's report, the defendant's mother assisted with laundry at the victim's home or the defendant deposited clothing in the hamper in the victim's room. Apart from the DNA transfer theory, the defendant's other primary strategy

---

[23] For instance, Williams testified in part: "So the forensic interview process looks to clarify inconsistencies, we expect to have some, but there's a difference between [an] inconsistency and a discrepancy. And so . . . an inconsistency we expect. A discrepancy would be, for example . . . if I was interviewing . . . a child who had been beaten very much and was in the hospital . . . and I'm interviewing them about the physical abuse and they say: 'Nope, I was never physically abused,' but then later in the interview may . . . refer to being hit with a broom or something, that would be a discrepancy, versus an inconsistency where a child might say: 'Well, the blanket was red,' but the blanket was blue, because we really haven't gathered all that information, and so they've told that one person and that one person only heard that one aspect, and the child's memory might have been when there was a red blanket there, so those inconsistencies we expect them, and . . . if the child provides a credible enough disclosure, then those inconsistencies may be cleared up and then simply . . . the other investigators would move on with their investigation."

was to attempt to undermine the credibility of the victim's story by calling the jury's attention to claimed inconsistencies in the victim's retellings of what happened, but, importantly, these purported inconsistencies were explained as being common and, in fact, expected, by the state's expert witness on child forensic interviews.

In the present case, the court provided defense counsel with a full opportunity to engage in "unfettered cross-examination" of Koval about the missing photographs; *State* v. *Gray*, supra, 212 Conn. App. 216; and likewise permitted him to focus on the state's loss of the photographs during closing argument. This resulted in the jury having an adequate opportunity to consider the defendant's narrative, the reason the photographs were lost, and the prejudicial concerns stemming from the unavailability of the photographs. Furthermore, the state introduced into evidence several photographs taken of the underwear at the state laboratory by the forensic examiner, and its case was not based on the missing photographs. See *State* v. *Weaver*, 85 Conn. App. 329, 353, 857 A.2d 376 (fourth *Asherman* factor weighed in state's favor because state's "strong" case "was not in any way based upon the lost evidence"), cert. denied, 271 Conn. 942, 861 A.2d 517 (2004). There was also no affirmative evidence in the record indicating that the victim possessed a motive to fabricate the accusation against the defendant or had a tendency to be dishonest. See *State* v. *Morales*, 39 Conn. App. 617, 629–31, 667 A.2d 68 (weighing victim's credibility during prejudice analysis in *Asherman* challenge to, inter alia, sexual assault conviction), cert. denied, 235 Conn. 938, 668 A.2d 376 (1995); cf. *State* v. *Aaron L.*, 272 Conn. 798, 815–16, 865 A.2d 1135 (2005) (considering victim's "motive to fabricate or lack thereof" as factor in evaluating admissibility of statement under residual exception to hearsay rule (internal quotation marks omitted)).

Accordingly, any prejudice to the defendant resulting from the missing photographs was minimal, and we conclude that the fourth *Asherman* factor weighs in favor of the state.

For the foregoing reasons, having determined that all of the *Asherman* factors, on balance, weigh against the defendant with respect to the lost photographs, we conclude that the defendant was not deprived of his state constitutional right to due process.

## II

The defendant next claims that the court abused its discretion in conducting an insufficient inquiry into an allegation of juror misconduct. Specifically, he argues that the inquiry the court engaged in was not adequate under *State* v. *Brown*, 235 Conn. 502, 668 A.2d 1288 (1995),[24] given the nature of the allegation and defense counsel's request that further inquiry, including the recalling and questioning of a particular juror, be conducted. The defendant asks this court for a "remand to conduct a *Brown* inquiry [that] appropriately addresses the allegations of juror misconduct." Conversely, the state argues that the extent of the court's inquiry was appropriate and within its discretion. We agree with the state.

The following additional facts and procedural history are relevant to our analysis of this claim. On August 26, 2022, at the start of the defendant's sentencing hearing, the court indicated to both parties that an allegation of juror misconduct raised by defense counsel needed to be addressed. Defense counsel then described the

---

[24] In *State* v. *Brown*, supra, 235 Conn. 504, our Supreme Court held that the trial court's "duty to conduct an inquiry into . . . allegations [of serious jury misconduct]" was triggered when the court "received an anonymous note" informing it that "the jurors overheard the sheriffs betting that the defendant would be found guilty because he was black and from New York." (Internal quotation marks omitted.) Id., 519–20.

issue and how it had come to his attention, stating: "Early . . . last week, [the defendant] advised me of a conversation he had with a young man by the name of Nathan Gray. . . . Gray had advised [the defendant] that he had spoken to a gentleman by the name of Chris [Durante] through work. [Durante] was a supervisor at [their workplace]. He worked with [Gray]. [Durante] had spoken to one of the jurors, and what was conveyed by [Durante] to [Gray], was that this juror had told him that at some point during the trial [the juror] knew what he was gonna say before he went into the jury room. That information, once it got to me, I contacted my investigator and I asked my investigator to, basically, track this down. I had him start by talking to . . . Gray. The investigator confirmed the information from . . . Gray. . . . [M]y investigator then went and spoke to . . . Durante about this alleged conversation with the juror. . . . Durante denied having that conversation to my investigator, so my investigator then came back to me with that information. I asked my investigator to follow up with . . . Gray. . . . Gray remained consistent in what he said, and we obtained a statement from him . . . . [W]hen I got the statement in my possession, I contacted the state's attorney, let her know and explained, basically, what I just explained to the court, and provided a copy of the statement as well so that's how we got to this point. And then, at some point this week, it was brought to the court's attention, and we are here today."

The court then engaged in a preliminary inquiry into the allegation by questioning defense counsel about it. In response to the court's questions, defense counsel explained that the source of the allegation, Gray, is the boyfriend of the sister of the defendant's girlfriend and that Durante "denied ever having that conversation . . . with [Gray] or the juror." Defense counsel conceded that the statement "is hearsay layered upon hearsay" but nevertheless asked the court to find that "a

sufficient basis [existed] to conduct further inquiry and to conduct some inquiry of the juror himself." The state opposed further inquiry by the court into the allegation.

After hearing argument from both counsel on the issue, the court recessed for a short period and then orally denied the defendant's request for further inquiry into the allegation of juror misconduct. In doing so, the court applied the factors set forth by our Supreme Court in *Brown*, discussing each factor in detail, and concluding, in pertinent part: "[R]elevant case law states that a trial court must conduct a preliminary inquiry on the record whenever it is presented with any allegations of juror misconduct in a criminal case. Although the form and scope of such an inquiry lie within a trial court's discretion, the court must conduct some type of inquiry in response to the allegations of jury misconduct. . . . Whether a preliminary inquiry of counsel or some other limited formal proceeding will lead to [more] extensive proceedings will depend on what is disclosed during the initial limited proceeding and on the exercise of the trial court's sound discretion with respect thereto. . . .

"In this case, the defendant did not in [the court's] opinion, request only a minimal type of proceeding: it asked that the court bring in the actual juror who committed the alleged misconduct. In contrast, although the defendant can request an evidentiary hearing, the trial court should not hold such a proceeding if it's persuaded that a less extensive inquiry is more appropriate in light of all the circumstances; so, the court is taking that factor into consideration. . . .

"The defense has presented extremely weak evidence relevant to its claim of juror misconduct and rel[ies] solely on double hearsay statements that were denied by the middle declarant . . . Durante. . . . Gray has a connection or apparent possible bias to the defendant as there's a nexus between him and the defendant's girlfriend. The statement is also very vague. We don't

know at what point of the trial or . . . when the statement was made. It could have been made during deliberations. The court is [entitled] to rely on its jury instructions that the jury would not deliberate until all evidence was submitted to the jury and that [it] would deliberate in good faith. Again . . . Durante denies making the statement. I'll also note that, during the trial, the jury did in fact have readback and a question relative to the evidence. There's nothing in the statement to suggest either that he shared any of his thoughts with the other jurors. Balancing those factors against the state's strong interest in the finality of verdicts and how our caselaw explains [that] the danger in discussing or forcing a juror to come in, explain his thought process during the trial or during the deliberations, simply outweighs having any evidentiary proceeding based on the facts and circumstances of this case.

"So, the inquiry will end here. And again, based on these factors and weighing these factors and circumstances of . . . Gray's statement, its reliability, its bias, versus the strong interest with the finality of judgments and the state's [interest in] protecting the privacy and integrity of any jury deliberations, a full evidentiary hearing is not warranted."

We next set forth our standard of review for a claim that a court's inquiry into an allegation of jury misconduct or bias was insufficient. "[J]ury impartiality is a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors. . . . The modern jury is regarded as an institution in our justice system that determines the case solely on the basis of the evidence and arguments given [it] in the adversary arena after proper instructions on the law by the court. . . . We have recognized, moreover, that [t]he trial court, which

has a [firsthand] impression of [the] jury, is generally in the best position to evaluate the critical question of whether the juror's or jurors' exposure to improper matter has prejudiced a defendant." (Internal quotation marks omitted.) *State* v. *Montanez*, 185 Conn. App. 589, 602–603, 197 A.3d 959 (2018), cert. denied, 332 Conn. 907, 209 A.3d 643 (2019).

"Our review on appeal is limited to the inquiry of whether the court's review of the alleged jury misconduct can be characterized fairly as an abuse of discretion"; *State* v. *Kamel*, 115 Conn. App. 338, 343, 972 A.2d 780 (2009); and "[a]ppellate review of a trial court's preliminary inquiry into claims of jury misconduct or bias is governed by [*Brown*]. In *Brown*, our Supreme Court invoked its supervisory authority over the administration of justice to hold that a trial court must conduct a preliminary inquiry, on the record, whenever it is presented with any allegations of jury misconduct in a criminal case, regardless of whether an inquiry is requested by counsel. . . . The form and scope of such inquiry is left to the discretion of the trial court based on a consideration of multiple factors, including: (1) the private interest of the defendant; (2) a risk and value assessment of additional procedural safeguards; and (3) the [state's] interest. . . . In outlining these factors, we also [have] acknowledged, however, that [i]n the proper circumstances, the trial court may discharge its obligation simply by notifying the defendant and the state of the allegations, providing them with an adequate opportunity to respond and stating on the record its reasons for the limited form and scope of the proceedings held. . . . Accordingly, [a]ny assessment of the form and scope of the inquiry that a trial court must undertake when it is presented with allegations of jur[or] [bias or] misconduct will necessarily be fact specific." (Citations omitted; internal quotation marks omitted.) *State* v. *Montanez*, supra, 185 Conn.

App. 603–604; see also *State* v. *Biggs*, 176 Conn. App.
687, 704, 171 A.3d 457 ("we recognize that the trial court
has wide latitude in fashioning the proper response to
allegations of juror [misconduct]" (internal quotation
marks omitted)), cert. denied, 327 Conn. 975, 174 A.3d
193 (2017).

"In *Brown*, [our Supreme Court] noted that '[t]here
may well be cases . . . in which a trial court will right-
fully be persuaded, solely on the basis of the allegations
before it and the preliminary inquiry of counsel on the
record, that such allegations lack any merit. In such
cases, a defendant's constitutional rights may not be
violated by the trial court's failure to hold an evidentiary
hearing . . . .' " *State* v. *Michael J.*, 274 Conn. 321, 340,
875 A.2d 510 (2005). "[O]f course . . . it is within the
discretion of the trial court to make credibility assess-
ments and determine whether the allegations [of juror
misconduct] are facially credible." (Internal quotation
marks omitted.) *State* v. *Roman*, 262 Conn. 718, 728,
817 A.2d 100 (2003); see also *State* v. *Brown*, supra,
235 Conn. 527–28 ("the trial judge has a superior oppor-
tunity to assess the proceedings over which he or she
personally has presided . . . and thus is in a superior
position to evaluate the credibility of allegations of . . .
misconduct, [regardless of] their source" (citations
omitted)).

"[A]lthough the defendant can request an evidentiary
hearing, the trial court should not hold such a proceed-
ing if it is persuaded that a less extensive inquiry is
more appropriate in light of all the circumstances. . . .
It should also consider the seriousness of the allegation
by taking into account the prejudicial nature of the
alleged misconduct as well as the nature and degree of
the jury's alleged involvement in the misconduct. . . .
*Brown* also advises that, when exercising its discretion
as to how to proceed with a claim of juror misconduct,
a court should credit the [state's] interest in the finality

of judgments, protecting the privacy and integrity of jury deliberations, preventing juror harassment, and maintaining public confidence in the jury system." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Biggs*, supra, 176 Conn. App. 709–10.

We conclude that the court did not abuse its discretion in denying the defendant's request for additional inquiry into the allegation of juror misconduct. By notifying the parties about the allegation, engaging in a preliminary inquiry during which it questioned defense counsel and heard from both parties on the issue, and then thoughtfully applying the *Brown* factors after learning about the allegation, the court conducted the "meaningful, on the record, preliminary inquiry . . . required by *Brown* and its progeny." *State* v. *Kamel*, supra, 115 Conn. App. 344; see *State* v. *Biggs*, supra, 176 Conn. App. 711 n.7 ("[a]lthough . . . courts have heard testimony from jurors accused of misconduct before rendering decisions as to whether juror misconduct occurred and thus prejudiced the defendant . . . the court here was within its province to determine, in its fact specific inquiry, that such testimony was unnecessary in light of its preliminary inquiry" (citation omitted)). The court specifically stated on the record its reasons for the limited form and scope of its inquiry; see *State* v. *Montanez*, supra, 185 Conn. App. 604; particularly, its findings that the source of the allegation was connected to the defendant, the statement itself was vague, it was double hearsay, and the purported middle declarant of that double hearsay statement denied ever having made the statement.

The facts of the present case fall squarely within those cases in which we have held that the court's inquiry was adequate under *Brown*.[25] For example, in

---

[25] The present case differs from those in which we have found a court's inquiry into an allegation of juror misconduct or bias to be insufficient under *Brown*. For instance, in *State* v. *Kamel*, supra, 115 Conn. App. 348–50, we

*State* v. *Necaise*, 97 Conn. App. 214, 220–26, 904 A.2d 245, cert. denied, 280 Conn. 942, 912 A.2d 478 (2006), we determined that the court responded appropriately after it received a note from a juror suggesting possible bias by conducting a preliminary inquiry, on the record, in which it notified the parties about the note, gave them an opportunity to propose possible remedial actions, including requesting further inquiry, and then determined that a curative instruction without further inquiry was warranted. See also *State* v. *Alston*, 272 Conn. 432, 453, 862 A.2d 817 (2005) (court did not abuse its discretion and clearly satisfied preliminary inquiry required by *Brown* when, "[a]fter learning about the alleged misconduct, the . . . court, on the record, alerted both parties to it [and] allowed them to respond and to request a more extensive inquiry"). Likewise, in the present case, the court notified the parties, on the record, about the allegation, inquired into the allegation by questioning defense counsel, and provided both the state and the defendant an opportunity to be heard as to how it should proceed. In light of the "wide latitude" the court has in making credibility determinations and "in fashioning the proper response to allegations of juror [misconduct]" under *Brown*; (internal quotation marks omitted) *State* v. *Biggs*, supra, 176 Conn. App. 704; and the nature of the allegation made in the present case, as revealed through the court's meaningful questioning, the court was well within its discretion to "dis-

---

held that the court abused its discretion by failing to conduct the meaningful, on the record, preliminary inquiry required by *Brown* because, after the court discovered brass knuckles—which were not admitted into evidence—in the jury deliberation room, it failed "to inform both sides that the jury was exposed to the brass knuckles," or to inquire into the matter on the record. See also *State* v. *Roman*, supra, 262 Conn. 727–28 (court abused its discretion by failing to conduct any on record inquiry into specific and facially credible allegation that juror spoke to victim's family member); *State* v. *Centeno*, 259 Conn. 75, 82–83, 787 A.2d 537 (2002) (court abused its discretion by failing to conduct at least "some inquiry" on record into defendant's facially credible allegation that he knew juror from prior, possibly criminal, relationship).

charge its obligation simply by notifying the defendant and the state of the allegations, providing them with an adequate opportunity to respond and [then] stating on the record its reasons" for going no further than a preliminary inquiry, as it did. (Internal quotation marks omitted.) *State* v. *Montanez*, supra, 185 Conn. App. 604.

We conclude that it was not an abuse of discretion for the court to determine that recalling a juror for questioning three months after the jury delivered its verdict was unwarranted; see *State* v. *Biggs*, supra, 176 Conn. App. 709; see also *United States* v. *Scarfo*, 41 F.4th 136, 209 (3d Cir. 2022) ("substantial evidence of jury misconduct . . . [is required] [before] a district court may, within its sound discretion, investigate the allegations through juror questioning" (internal quotation marks omitted)), cert. denied sub nom. *Pelullo* v. *United States*, U.S. , 143 S. Ct. 1044, 215 L. Ed. 2d 201 (2023); *Walters* v. *Hitchcock*, 237 Kan. 31, 36, 697 P.2d 847 (1985) (acknowledging that "recall of jurors after their service has ended to testify . . . is a serious step"); and that, instead, a less extensive inquiry was appropriate given the circumstances surrounding the allegation and the considerations outlined in *Brown*.[26] Accordingly, we reject the defendant's claim that the court abused its discretion in declining to engage in further inquiry into the allegation of juror misconduct.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[26] "Moreover, [when, as here] the trial court was in no way responsible for the juror misconduct . . . we have repeatedly held that a defendant who offers proof of juror misconduct bears the burden of proving that actual prejudice resulted from that misconduct." (Internal quotation marks omitted.) *State* v. *James H.*, 150 Conn. App. 847, 854, 95 A.3d 524, cert. denied, 314 Conn. 913, 100 A.3d 404 (2014). The defendant has not made any such showing of prejudice in his brief or at oral argument before this court.